**TEXAS & N. O. R. CO. v. GOODWIN et ux.**

**No. 2087.**

Court of Civil Appeals of Texas. Beaumont. June 29, 1931.

Rehearing Denied July 1, 1931.

Davis & Davis, of Center, and Baker, Botts, Andrews & Wharton and Arterbury & Coolidge, all of Houston, for appellant.

Jones & Jones, of Marshall, and Maurice Short and Dallas Ivey, both of Center, for appellees.

## WALKER, J.

This was an action by appellees, B. V. Goodwin and wife, against appellant, for damages for the death of their minor son, Hulon Goodwin. Appellees plead many grounds of negligence against appellant, but only the following issues of negligence were submitted to the jury: (a) The failure of the operatives of the train to keep a lookout and to observe the position of appellees' automobile on the track in time to stop the train and avoid the collision; (b) in the alternative, if a lookout was kept, and if the operatives of the train observed the automobile stalled upon the crossing, they negligently failed to stop the train or slacken its speed in time to avoid a collision; (c) the operatives of the train negligently failed to see or observe the condition of appellees' automobile in time to avoid the collision; (d) generally, the issue of discovered peril.

Appellant answered appellees' petition by pleas of general and special demurrers and general denial, and the following special pleas of contributory negligence against appellee B. V. Goodwin: (a) He failed to look for a train as he entered upon appellant's right of way; (b) he failed to look and listen and discover the approach of appellant's train in time to extricate himself and son from danger; (c) he was driving under the influence of intoxicating liquor, which caused the collision; (d) he was guilty of contributory negligence, as a matter of law. Appellant also pleaded that it settled with appellees for the death of their son, paying them $600 therefor, and that appellees executed a written release against the claim asserted by this suit.

Appellees answered the plea of release as follows: They were untrained farmers, unversed in methods and transactions of the business world, not highly educated, and all writings signed by them were written and prepared by appellant's claim agent; before signing any papers for said agent they expressly stated that they were not settling or releasing any claim for damages on account of the death of their son, and the claim agent falsely and fraudulently represented to appellees that said writing signed by them was simply a release of their claim for damages arising out of the destruction of the automobile and the personal injuries received by appellee B. V. Goodwin; that by these false representations of the agent they were induced to sign the release specially plead by appellant. All the issues of negligence above summarized were found by the jury in appellees' favor, and appellee B. V. Goodwin was acquitted of all acts of contributory neg-

ligence. The issues arising against the written release specially plead by appellant were submitted to the jury as follows, and answered as indicated:

"Special Issue No. 1–A.

"Do you find from a preponderance of the evidence in this case that on January 16th, 1930, the date of the releases signed by B. V. Goodwin and Vessa Goodwin, one reciting a consideration of $600.00 and the other reciting a consideration of $333.00, and the checks issued by the defendant company to correspond with each release, that it was the intention and understanding with B. V. Goodwin and Vessa Goodwin and the defendant company to accept these payments in full and final settlement for the death of their son, Hulon Goodwin?" Answer: "No."

"Special Issue No. 1—A.

"Do you find from a preponderance of the evidence in this case that at the time plaintiffs signed the release and check for $600.00 on January 16th, 1930, defendant's claim agent represented to them that they were not settling for any injuries on account of the death of their son, Hulon Goodwin?" Answer: "Yes."

"Special Issue No. 1–B.

"Do you find from a preponderance of the evidence that the plaintiffs believed said representations made by said claim agent were true?" Answer: "Yes."

"Special Issue No. 1–C.

"Do you find from a preponderance of the evidence that plaintiff's belief of said representations induced them to sign said instruments on January 16th, 1930?" Answer: "Yes."

Appellees' damages were assessed at $5,000 and judgment accordingly entered in their favor, from which appellant's appeal has been duly prosecuted to this court.

The following are the facts relied upon by appellees to escape the effect of the written release executed by them. Their son, Hulon Goodwin, was killed by appellant's train on the 24th of December, 1929. About three weeks after the accident appellant's claim agent negotiated a settlement with appellees which, on its contention, adjusted all claims for the destruction of the car, for personal injuries received by appellee B. V. Goodwin in the accident, and the death of Hulon Goodwin. The car was totally destroyed, and B. V. Goodwin was slightly injured. According to appellant's contention, it was to pay appellees for this release, $1,250, of which amount $600 was for the death of Hulon Goodwin, $333 for the injuries to B. V. Goodwin and the destruction of the car, and the balance to a finance company that held a lien against the car. Two written releases were executed by appellees. One release purported

to settle the injuries to appellee B. V. Goodwin and the damages to the car, and recited a cash consideration of $333. The other release purported to settle for the death of Hulon Goodwin, and recited in part as follows: "In consideration of the sum of six hundred dollars ($600.00) to us this day paid by the Texas & New Orleans Railroad Company, we hereby release said railroad and all lessor and connected or associated companies from all claims, demands and causes of action against it and them which have accrued and may hereinafter accrue, to us for all damages of every nature whatsoever received in and resulting from an accident at or near Joaquin, Texas, on or about December 24, 1929, in which our son, Hulon Goodwin, was injured fatally, when auto he was riding in was struck by engine 263 handling train 25."

This release was, in fact, signed by both appellees and verified by them as follows:

"The State of Texas, County of Shelby.

"Before me, the undersigned authority, in and for said State and County, on this day personally appeared B. V. Goodwin and wife, Mrs. Vessa Goodwin, known to me to be the persons whose names are subscribed to the within instrument, and being by me first duly sworn on oath, state that they executed the same for the purposes and consideration therein expressed; that they had read it, fully understands its meaning and effect, knows it is an unconditional release in full, and that they voluntarily executed it as such.

"Given under my hand and seal of office on this, the 16th day of January, 1930.
"E. L. Ramsey,
"[Seal] Notary Public,
"Shelby County, Texas."

Against these releases appellees testified that at the time they signed and swore to the release for the death of their son, Hulon, the claim agent told them that the two releases were identical in all respects, and that the release was only for the injuries received by B. V. Goodwin and for damages to the car; the release for appellee B. V. Goodwin's injuries and for damages to the car was read to them, but when the notary public started to read the other release the claim agent stopped him and said to the notary, "this paper is just like the other one"; all during the negotiations appellees refused to settle with the claim agent for the death of their son, and during the negotiations, and while the claim agent was preparing the releases, he repeatedly told them that he was not negotiating a settlement for the death of their son, but only for the other claims. On this issue B. V. Goodwin testified:

"It was the understanding all the way through that we were not settling for the child and when he spoke to my wife he said 'Mrs. Goodwin, we are not settling for the child, we are settling for the car and for

Victor being hurt—not for the baby at all.' My wife was crying when he made that statement to her in my hearing. * * * Mrs. Goodwin was crying during all of that time (the negotiations in the drug store) and the claim agent said to her, 'You are not settling for your baby, Mrs. Goodwin—you are not settling for the baby at all.' He told my wife that in my presence and I relied on that statement he made because he had treated me like a nice man and I did him and I took him to be a man like myself.

"In response to the question, 'State whether or not you would have signed any of those papers if you had not believed the statement of the claim agent,' the witness answered: 'It was not the agreement that I was, and if it had been I would not have signed them at all because it was not the agreement that I was to sign for my baby at all. I would not have signed any of those papers if the claim agent had not told me that I was not settling for my child. I relied on that statement.'

"* * * The reason we did not read them was that he objected to Mr. Ramsey reading it to us and he told us that it was just exactly like the other one that Mr. Ramsey did read to us. (In response to question from Mr. Jones, the witness stated that 'he' was the claim agent.)

"This was all one transaction and signing the releases and handing the drafts over—it all took place there at the same time at the drug store and all the conversation there about the releases which were made there."

Appellee Mrs. Goodwin testified: "There was not anything said to me and my husband with reference to whether or not we were settling for the death of our child, but we were not, as the claim agent said we were not signing for the death of the child, and he said that more than once. I would not have signed any paper there at all if it had not been for the statement of the claim agent that I was not signing for the child—I was not signing for the child and that was not our agreement. I relied on the statement of the claim agent that I was not signing for the death of our child."

Carlton Goodwin testified: "There was not anything read there (drug store) at any time that said anything about the death of my brother. I heard a statement from the claim agent with reference to a settlement for the death of my brother before my mother signed any of those instruments. My mother was crying and he called her attention and told her we were not settling for the baby."

Against the submission of the foregoing issues relating to the release and the jury's answers thereto, appellant makes the following contentions:

(a) Question No. 1 was duplicitous. This contention is overruled. The testimony quoted above raised the issue that it was the intention of appellees, in signing the release in question, not to release appellant for damages for the death of their son. Also, if the testimony of appellees was to be believed, the real intention of appellant was that appellees were not to be released. The agent so stated to them, and upon his representation they signed the release and he accepted it. The intention, in fact, of appellant, in accepting the release from appellees, must be gathered from the terms of the contract upon which it was executed and delivered. The secret, fraudulent intent on the part of the claim agent to induce appellees to sign a release against the express intention of both parties forms no part of the contract. So far as question No. 1 was material, upon the issues involved, this exception against this question becomes immaterial and should not constitute reversible error. However, we think the answers of the jury to questions 1–A, 1–B and 1–C sufficiently dispose of the release, and that question No. 1 becomes immaterial.

(b) A second contention against the jury's verdict is that appellees, having sworn that they had read the release and fully understood it, cannot be heard to say "that they swore to an untruth" and "it is contrary to law and to public policy to allow parties who can read and have full opportunity to read an instrument, to sign the instrument * * * and swear before a notary public that they have read it * * * and later to come into court and say they did not know what they were signing, and that the oath they took before the notary was false." There is no merit in this contention. Under the statement of appellees, they signed and swore to the release in question, believing that it was the release for the destruction of the car and for the injuries received by appellee B. V. Goodwin; they were induced to so believe by the fraudulent conduct and representations of appellant's agent; and, having an opportunity to read it, they were persuaded by appellant's agent not to do so on his statement that it was identical with the release that had been read to them. A principal cannot secure immunity from the consequences of his fraud by having the contract sworn to, as was done in this case, nor can he in that manner evade responsibility for the fraud of his agent, which inures to his benefit. Threshing Machine Co. v. Webb (Tex. Civ. App.) 181 S. W. 853. Acknowledgments to deeds, secured by fraud, are set aside. Conn v. Hagan, 93 Tex. 334, 55 S. W. 323, 325. When once it is established that a person has been induced to enter into a contract by fraud, it is no answer to his claim to be relieved from the contract to say that he might have known the truth by proper inquiry. Labbe v. Corbett (Tex. Sup.) 6 S. W. 812; Western Union Telegraph Co. v. Walck (Tex. Civ. App.) 161 S. W. 902; Chatham v.

Jones, 69 Tex. 744, 7 S. W. 600; Railway Co. v. Shuford, 36 Tex. Civ. App. 251, 81 S. W. 1189; Railway Co. v. Harris (Tex. Civ. App.) 65 S. W. 885; Railway Co. v. Green (Tex. Civ. App.) 135 S. W. 1031; Transportation Co. v. Winters (Tex. Civ. App.) 193 S. W. 366; Railway Co. v. Thompson (Tex. Com. App.) 12 S.W.(2d) 963. In Conn v. Hagan, supra, it was said: "When the party is misled by the fraudulent representation of the other party, and caused, by confidence in such person and his representations, to sign the instrument without reading it, this does not constitute such negligence as will deprive the maker of the instrument of equitable relief from the consequences of the fraudulent representation."

■ (c) It is also contended that the answers of the jury to the foregoing questions are against the great weight and preponderance of the evidence. This contention is overruled. Appellant made a very strong case against appellees' contentions, but, as seen from the quotations we have made from the record, there was abundant evidence supporting their theory of the case and, in our judgment, it would be an abuse of the prerogatives of this court to set aside the jury's verdict on the ground that their answers were without support on these issues.

The issue of discovered peril was submitted by the following questions, answered as indicated:

"Special Issue No. 7.

"Do you find from a preponderance of the evidence in this case that the deceased, Hulon Goodwin, was placed in a position of peril before the collision, as alleged in plaintiffs' petition?" Answer: "Yes."

"Special Issue No. 8.

"Do you find from a preponderance of the evidence in this case that those operating the train of the defendant company knew of the perilous situation of Hulon Goodwin, deceased, in time by the exercise of ordinary care, in the use of all means at hand consistent with the safety of the train and passengers thereon, to have avoided injuries to deceased?" Answer: "Yes."

The contention is made (a) that these issues were not raised by the evidence, and (b) the jury's answers thereto are without support in the evidence. The facts are as follows: appellee B. V. Goodwin with his four year old son, Hulon, left his home, west of Joaquin, on the morning of December 24, 1929, in a Chevrolet coach, for the purpose of making a visit to the home of his father-in-law, Mr. John Chesshire, who lived east of Joaquin and on the north side of highway No. 35, which runs through Joaquin in a general easterly and westerly direction. Appellant's railroad track runs parallel with a highway in front of the Chesshire home and is between the highway and the Chesshire home. At that point the railroad right of way is fenced, but appellant maintained a gate in the right of way in front of the Chesshire home for the use of the public, generally, in going to and from the Chesshire home, that is to say, the crossing was not merely for the private use of Mr. Chesshire, but for the public, generally, for the purpose stated. At that point the appellant's track is straight towards the west and east on both sides of the crossing for something like three-quarters of a mile. The approach to the crossing from the highway is level for a distance of about 25 feet, then 20 feet up grade, and level about 12 feet to the center of the track. The approach of the railroad to the east toward the crossing is a little up grade, and the distance from the gate to the railway track was about 50 or 55 feet. On the morning in question a very heavy snow was on the ground, but appellant's steel rails were not covered with snow. In attempting to drive his car up to the Chesshire house on the morning in question, appellee B. V. Goodwin drove down the highway to the gate in front of his father-in-law's house, then through the gate and onto the railroad track. When he drove upon the track, his car stalled. While the car was thus stalled upon the track it was struck by appellant's west-bound passenger train and hurled to the distance of about 75 feet. The train ran its full length, and 140 feet beyond the crossing. As above stated, Hulon Goodwin was killed in the collision, B. V. Goodwin slightly injured, and the car destroyed.

In its brief appellant says "the evidence shows that the track was straight for three-quarters of a mile or more." In its answer it alleged: "Plaintiffs admit that the right of way is straight and level for at least three-quarters of a mile on each side of the crossing in question in both directions from same * * * and that there was absolutely nothing to prevent him (meaning plaintiff) from seeing said train, and that the weather was clear."

Further explaining the facts of the accident, we quote with approval appellees' summary of the testimony:

"Plaintiff drove his car from the highway toward the track of defendant. When about thirty-five feet from the track, plaintiff looked to the east, which afforded him a view 500 yards up the track, and there was not any train in sight at that time. The roadway looking as though cars had been going in and out, plaintiff thought he could also navigate the crossing, but when he got to the upgrade of the crossing, his front wheels dropped in between the middle of the two rails and his back wheels began to spin, causing the car to stop with the front wheels between the rails. The condition of the track made in the road by the car near the crossing showed after the accident that the wheels

had been spinning. Plaintiff began to 'rock' or 'jump' the car by throwing in the clutch and releasing it in an effort to dislodge it from its position and after doing this three or four times, during which time plaintiff did not hear any train approach or any whistle blown or bell rung, plaintiff's son stated that a train was coming. Plaintiff had not made an effort to dislodge the car by putting it in reverse, but had been trying to kick it over the track; so he made one last effort to dislodge and remove the car by throwing it in reverse to see if it would kick back over, but the rail stopped the wheels, leaving the car on the track.

"Plaintiff then turned around and got his child and saw the train for the first time, at least 250 yards from him. Simultaneously with turning to get his child, plaintiff opened the left door with his left knee, and had gotten out on the fender with the child when the train struck the car. In order to take the child from the car it was necessary to turn the right front seat down and lean back toward the back seat, something like two or two and a half feet, to reach the child.

"Plaintiff testified that as he approached the track, he was moving at three, or maybe four, miles per hour and that with his knowledge of speed, he could have easily crossed over the track before a train could have run a distance of four hundred yards or three hundred yards travelling at a speed of 45 miles an hour, if he had not been stuck on the track between the time he looked up the track at the point 35 feet distant and before the train struck his car. That the reason plaintiff did not look after he passed the point 35 feet from the crossing where he could see east a distance of four or five hundred yards, was his knowledge of the facts just set out.

" * * * The train approached from the east to the crossing at a speed of about 45 miles per hour. It consisted of four or five cars, and never quit working steam before the collision; the operators of the train never shut off the power or quit working steam before the collision, much less applied the brakes.

"Particularly do we call attention to the testimony of John Chesshire, who observed the train through a window of his house, seeing it approach something like 300 yards east of the crossing and watching it until it passed out of his view about 40 feet east of the crossing to the effect that the train never did quit working steam while it was in his sight.

"During the time the train was approaching the crossing, the automobile of the plaintiff was stalled on the track with the wheels spinning, and being jerked forward and backward in an effort to remove it from the track. It is undisputed that the operatives of the train had a straight and unobstructed view as the same approached from a point three-quarters of a mile east of the crossing.

" * * * The car was stalled on the track and had been making efforts to get off when the train was well to the east of a point 250 yards from the crossing. Leland Smotherman testified he was on the Joaquin and Logansport road at the time of the accident (which runs parallel with the track) some 100 yards west of the crossing and noticed Mr. Goodwin's car sitting up there on the track; that he did not know how long it had been there at the time he first saw it, and that he saw the train when it was 100 yards east of the crossing; that the car was rocking back and forth, 'chugging up and down' on the track. This witness testified that he was qualified to tell whether the engine quit working steam or the brakes were applied, and that if the engine ever quit working steam or the brakes were applied on that engine and train from the time he saw it, 100 yards east of the crossing until the collision, he did not see it. He also testified that he saw the automobile at the very instant the train hit it, at which time Mr. Goodwin was trying to get out of his automobile and had one leg on the fender; that at this time the car was shaking.

"Mr. W. L. Childs was on the highway going to Haslom at the time of the collision, located about 75 or 80 yards west of the crossing. He noticed the automobile and train at about the same time, observing that the fore wheels of the automobile were on the crossing. At that time the train was about the same distance from the automobile as was the witness, some 75 or 80 yards down the track toward the east. The engine worked steam from the time the witness first saw it until after the collision. To this witness, it appeared that the automobile was standing perfectly still on the track; that when this witness saw the car and saw the train, he knew if the train did not stop or the car get off, the train would hit it.

"Julia Chesshire, witness for the plaintiff, substantiated the testimony that the car was rocking backward and forward while up there on the track; that it had been on the track for some little bit before she saw the train.

"Although there was no snow on the rails, and the sun had been shining on them all morning, the train collided with the car and ran west of the crossing its entire length and 140 feet more. It knocked the automobile 75 feet from the crossing and 25 feet from the rail.

"With these facts, which were not disputed by the appellant, the appellees offered in evidence the testimony of N. B. Holman, veteran railroad employee, who had had about fifteen years experience as brakeman and conductor on trains equipped with air brakes,

to the effect that a train with an engine carrying five or six coaches equipped with modern air brakes ought to stop in 200 feet where application of air was made on a level dry track when the train was running at 45 miles an hour. On cross examination this witness testified that on a cold day with about fourteen inches of snow on the ground, a passenger train running 45 miles an hour with all steel coaches, ought to stop in 200 feet if the brakes were put in emergency; that the witness had seen that done.

"Although both the engineer and fireman were in Center, under the rule of the court, and brought to court by the appellant, it did not use them as witnesses."

The undisputed facts in this case show that the operatives of the train had a clear view of the crossing and of the dangerous position occupied by appellee, with facts sufficient to advise them that his car was stalled on the track. If the operatives saw appellee's car, they must have known that an accident would result unless he drove his car off the track, or the train was stopped. Apparently, appellant contends that it cannot be convicted of discovered peril in this case, because there was no direct testimony that its operatives knew of appellee's danger; that their engineer and fireman were in attendance on court and were available to appellees as witnesses; that, not having used them as witnesses, the presumption must be that their testimony would have been unfavorable to appellees' contention. Appellant's contentions in this respect are not sound. It has long been the law of this state that discovered peril may be established by circumstantial evidence, even against the direct testimony of the operatives of the train. Thus, in Brown v. Griffin, 71 Tex. 654, 9 S. W. 546, 547, the Supreme Court said: "Upon the theory that the jury were found to believe the fireman who swore he did not see plaintiff, this may be true. But the proof is that he was upon the engine, operating it, and that there was nothing in front of it to obstruct his view of the track. The jury might have presumed from this that he did see the plaintiff."

Again, in Hines v. Arrant (Tex. Civ. App.) 225 S. W. 767, 769, the evidence was, as in this case, that the operatives of the train had a clear view of the track for a long distance and of the place of the accident. Discussing the issue of discovered peril, the court said: "It has been decided by the Supreme Court and by this court that under circumstances similar to this the denial of the engineer that he saw a party in danger is not conclusive of that question. Brown v. Griffin, 71 Tex. 654, 9 S. W. 546; Ry. Co. v. Finn [Tex. Civ. App.] 107 S. W. 94; T. & N. O. R. Co. v. House [Tex. Civ. App.] 208 S. W. 358; Trochta v. Ry. Co. [Tex. Com. App.] 218 S. W. 1038."

The court also said: "While the engineer testified that he did not see the appellee's danger until the latter was on the track, there were circumstances which indicated that he did."

The inferences to be drawn from the facts and circumstances in this case supporting the theory of discovered peril, instead of being weakened by the failure of appellees to offer as witnesses appellant's operatives of the train, were strengthened by the fact that appellant itself failed to offer these witnesses. Northern Texas Traction Co. v. Weed (Tex. Com. App.) 300 S. W. 41. Thus in Railway Co. v. Stovall, 272 S. W. 594, 596, speaking for the San Antonio Court of Civil Appeals, Judge Fly said:

"The appellant could have placed the engineer and fireman on the stand and have proved the train brakes were applied if it had been done. Neither was made a witness, and that fact is significant in tending to show that the train air brakes were not applied. The presumption would prevail that the engineer and fireman would have sworn that the air brakes were not applied to the train. They knew and were not called by the party whose interest it was to have shown the brakes were applied. The witnesses were the employees of appellant. As said in Railway v. Day, 104 Tex. 237, 136 S. W. 435, 34 L. R. A. (N. S.) 111:

"'Since this was a fact peculiarly within the knowledge of the railway company, its failure to produce such evidence, when, if inquiry had been made, the proof was, not only readily accessible, but of value to it, might well justify the jury in concluding no such inquiry had been made.'

"We add that it is further presumable that, if the inquiry was made as to the testimony of the engineer, it was ascertained that he would swear that he only applied the air to his engine and not to the train. The engineer and fireman were present at and during the trial and could have been used by their employer had it so desired. They were not used, and, as said in Farmers' Bank v. Burrus Mill Co. (Tex. Civ. App.) 207 S. W. 400:

"'The failure to produce evidence within a party's control raises the presumption that, if produced, it would operate against him; and every intendment will be in favor of the opposite party.'"

In Railway Co. v. Blair (Tex. Civ. App.) 184 S. W. 566, 568 (writ of error refused), the court said:

"The fact that appellant, although it had its witnesses present, failed and refused to place them on the stand is another pregnant circumstance tending to establish the truth of appellee's testimony. The presumption is that the evidence of their witnesses would not have shaken the evidence of appellee's witnesses, nor strengthened the case of appellant. Welsh v. Morris, 81 Tex. 159, 16

S. W. 744, 26 Am. St. Rep. 801. As said in Mitchell v. Napier, 22 Tex. 120:

" 'Where a party is thus afforded the opportunity to explain, and fails or refuses to do so, the rational and legal presumption is, that a disclosure of the truth would make against him. * * *'

"It was said by Lord Mansfield:

" 'It is certainly a maxim that all evidence is to be weighed according to the proof which it was in the power of one side to have produced and in the power of the other to have contradicted.'

"This is a quotation from an English case found by this court in Jones on Evidence, § 19."

We are thoroughly convinced that the issue of discovered peril was raised by the evidence, and that the jury's verdict has full support thereon.

Appellant has attacked, as being without support and as being against the great weight and preponderance of the evidence, the answers of the jury to the issues submitting its negligence, and the answers of the jury excusing appellees from contributory negligence. We think the statement made above fully sustains the jury's verdict convicting appellant of negligence on all issues submitted, and acquitting appellee of contributory negligence. Also, there was evidence to support the finding that appellee was not drunk at the time of the accident. We do not discuss these issues further, nor appellant's assignments that the court erred in refusing to submit certain special groupings of fact on the issue of contributory negligence, because the jury's verdict on the issue of discovered peril fully sustains the judgment, and we have merely referred to the jury's findings on the other issues in order that appellant may have the benefit of our rulings thereon in any further proceeding it may desire to take in this case.

For the reasons stated, the judgment of the lower court is in all things affirmed.