JULIA L. CREECH ET AL V. GUY A. THOMPSON,
TRUSTEE, ST. LOUIS, BROWNSVILLE &
MEXICO RAILWAY COMPANY

No. A-5611. Decided January 9, 1957.
Rehearing overruled February 13, 1957.
(297 S.W. 2d Series 817).

*M. E. Blackburn,* of Junction, *Morris, Underwood & Old-*

*ham,* of Houston, *Morriss, Morriss, Boatwright & Lewis* and *Will A. Morriss, Jr.,* all of San Antonio, for plaintiffs.

The Court of Civil Appeals erred in rendering judgment for the defendant and in not remanding that cause to the trial court. Turner v. Texas Co., 138 Texas 380, 159 S.W. 2d 112; Jackson v. Hall 147 Texas 245, 214 S.W. 2d 608; Lanford v. Smith, 128 Texas 373, 99 S.W. 2d 593.

*Hutcheson, Taliaferro & Hutcheson, Woodul, Arterbury & Wren,* and *Ray L. Arterbury, Howard S. Hoover,* and *Carrall R. Graham,* all of Houston, for respondent.

## ON REHEARING

MR. JUSTICE GARWOOD delivered the opinion of the Court.

By our original opinion delivered October 3rd, 1956, we affirmed the judgment of the Court of Civil Appeals, which in turn had reversed the trial court and rendered judgment for the respondent-defendant railroad on the ground that the verdict establishing a case of discovered peril was without support in the evidence. On rehearing we have concluded that this was error. Our original opinion is accordingly withdrawn and the following substituted therefor.

The petitioners (plaintiffs below) were the survivors and the workmen's compensation insurer of Alvin Benton Creech, who, while an employee of a road building contractor, was struck and killed by a train of the respondent on a narrow single track railroad bridge of the respondent over a heavily flooded creek south of Bishop and north of Kingsville, Texas. The deceased and a fellow employee, Lee, were on the bridge attempting to steer driftwood away from a downstream road bridge under construction by their employer. A sketch of the scene of the accident will be found in the published opinion of the Court of Civil Appeals. 284 S.W. 2d 256. We also refer to that opinion for a more detailed statement of the evidence.

The issues on discovered peril were the only liability issues submitted, and the corresponding answers in favor of the petitioners were the basis of the trial court's judgment, the holding of the Court of Civil Appeals being that the petitioners-plaintiffs "failed to meet the burden * * * of proving first, a discovery by appellant's (respondent railroad's) employees in such time that by the use of the means at hand they could have

avoided colliding with the deceased, and second, that such employees failed to use the means at hand to avoid the collision." The last named court also expressly held in the alternative that the verdict was against the great weight and preponderance of the evidence, and that the case should accordingly be remanded for a new trial in the event the principal holding of "no evidence" should be found to be erroneous.

■ Our actual problem is largely one of permissible reasoning on the part of the jury by way of inference from circumstances in evidence and reliance on part of the testimony while disregarding contrary parts of it. In keeping with the familiar rule for testing a verdict for "no evidence," we accept the evidence and permissible inferences therefrom most favorable to the verdict and so recite them unless otherwise indicated.

The accident occurred about 4 P.M. on a clear day in late April. The train, a "crack" passenger train of five cars and a diesel locomotive manned by an engineer and a fireman, was headed south. The general area was rural, open and level, and, for at least a mile north of the bridge, the track was straight and level, with no obstruction to vision between the locomotive and an object on the surface of the bridge, the latter being about 200 feet long, straight, flat and narrow, with no side rails or other superstructure, and no feature that would enable a person to remain on the bridge and yet avoid being struck by a passing train.

The deceased and his fellow employee on the bridge first became aware of the train's approach while they were standing somewhat less than 100 feet south of its north end and forthwith ran toward the south end, with Creech about two strides behind Lee and the train approaching from behind both. At approximately the south end, Lee jumped to the safety of the stream's bank, but just as he landed, Creech's body, struck by the train, fell near him.

The train as it approached the bridge was traveling at high speed, and did not come to a stop until the rear end was about 1500 feet south of the south end of the bridge. There was some testimony from bystander witnesses that the train did not appear to slow down prior to the actual collision.

The only direct evidence as to either the time of realization of the peril of the two men by the railroad operatives or the steps taken by the latter to avoid the accident, was the deposi-

tion testimony of the fireman, Lawrence, introduced under the adverse party rule. The testimony of the engineer, while available, was not used by either party. The fireman testified that, as the train approached the bridge, it was running at about 60 miles per hour, or 88 feet per second, and, in effect, that he and the engineer first realized the perilous situation of Creech and his fellow employee when the locomotive was about 400 feet north of the bridge, that is, about 600 feet from where Creech was struck, up to which point no effort had been made to reduce speed. He also testified that he himself took no preventive action at that time, because he saw that the engineer "was blowing his horn and getting his brake in the emergency place." He also testified that, some five seconds prior to that time, he saw "something" on the bridge but did not realize that it was men until reaching the further point stated, although visibility was such that he "could" see a man "safely" three-fourths of a mile ahead of him and did not know why he and the engineer did not see the men sooner than they did. He also admitted familiarity with the character and condition of the bridge and the flooded condition of the stream.

The fireman estimated that, from the speed stated, the train *could* be stopped within 2500 feet by use of its ordinary brakes and within 1250 feet by use of the emergency brake.

The total distance the locomotive traveled without stopping after the admitted point of "realization" (at some 400 feet north of the bridge) was about 2300 feet, or nearly half a mile, including the 400 feet just mentioned, the 200 foot length of the bridge, the 1500 feet from the south end of the bridge to the rear of the stopped train and the length of the train itself, which must have been at least 200 feet. The total distance traveled after the fireman first saw objects on the bridge was some 440 feet further, taking the additional time as five seconds and the speed as 88 feet per second. The total distance traveled by the locomotive after striking the deceased was 1500 feet plus the assumed length of the train (200 feet), or a total of 1700 feet. As before indicated, the distance between the position of the locomotive at the fireman's admitted point of "realization" and its position at the point of actual collision was some 600 feet. The latter figure must be raised to about 1000 feet, if we take the point of "realization" to be that at which the fireman acknowledged seeing objects on the bridge some five seconds prior to realizing that the objects were men.

Other testimony of actual or purported significance will be referred to as we proceed.

■ We first discuss the finding that realization of the peril of the deceased occurred in time to have saved him by proper use of the means at hand. The further essential question of whether those means were actually and diligently used is, of course, a quite different one, although in a given case their theoretical capabilities and effect as to decelerating the train might bear on that question as well as on the question of available time. Ford v. Panhandle & Santa Fe Ry. Co., 151 Texas 538, 252 S.W. 2d 561.

While the enquiry is obviously one of time, and the only testimony in direct terms of time is the fireman's statement as to when he saw objects on the bridge before realizing that they were men, we can yet properly reason also in terms of distance, which, as applied to a moving object, is an equivalent of time.

The fact of timely "realization" on the part of the train operatives, like that of whether they thereafter diligently used the means at hand, may be established by circumstances, with or without aid of their own testimony. And as to the latter, the jury may believe it in part while rejecting it in another part. Ford v. Panhandle & Santa Fe Ry. Co., supra; Texas & N. O. R. Co. v. Goodwin, Texas Civ. App. 40 S.W. 2d 182, wr. of er, refused; Hines v. Arrant, Texas Civ. App., 225 S.W. 767, writ of error refused; Brown v. Griffin, 71 Texas 654, 9 S.W. 546; see also Texas & N. O. R. Co. v. Grace, 144 Texas 71, 188 S.W. 2d 378; Turner v. Texas Co., 138 Texas 380, 159 S.W. 2d 112.

The jury could believe the fireman's testimony to the effect that the train was going at 88 feet per second at and.well prior to a point 600 feet from the point of collision and that before reaching the former point, and for some five seconds (or 440 feet at 88 feet per second) prior thereto, he was actually looking at the bridge (on which he said he saw "something"). The jury could also have believed all or any part of his testimony reflecting the prevailing favorable conditions of visibility, including the ability to distinguish a man at three-fourths of a mile. At the same time the jury could have disbelieved his statements that "realization" did not occur until the 600 foot point.

Accordingly the jury could properly have reasoned that "realization" actually occurred at a point 1040 feet from the point of collision. Texas & N. O. R. Co. v. Goodwin, Hines v. Arrant and Brown v. Griffin, supra, support such a view. In all of these cases, each of which involved the issue of discovered peril, the fact of "realization" has been held to be adequately

shown — as against a contention of "no evidence" — by circumstances of visibility. In the first case cited, there was an absence of direct testimony as to "realization," while in the others the only direct testimony was that of the train operatives, who denied seeing the victim of the accident or seeing him in time to have saved him. All of them were reviewed in the later case of Turner v. Texas Co., supra, without adverse criticism, although the Turner decision reached a contrary result. Our still later decision in Texas & N. O. R. Co. v. Grace, held, like the Turner case, that the circumstances did not raise a fact issue of timely "realization," but its pointed forbearance to discuss the decisions on which we now rely, while citing the Turner decision, confirms our view that the facts of these two later cases were essentially different from those of the earlier ones, as they are, in our opinion, from the facts of the instant case.

In other words, the jury could properly have reasoned that, the deceased being "safely" visible for three-fourths of a mile to a person in the situation of the train operatives, and the latter — particularly the fireman — actually looking down the track, as their duty required them to do and as the fireman said they were, they must have seen and realized the peril of the deceased at a point at least 1040 feet from the point of collision rather than at 600 feet as the fireman testified. In this connection the language of the holding in Brown v. Griffin, supra, seems most apt.[1] Such reasoning is obviously not the same as converting the statement of a witness into a different statement by the mere process of disbelieving the actual statement.

As to the difference between merely seeing the men and realizing their peril, we think the jury might properly have believed that, under the peculiar circumstances, seeing was the equivalent of realization. In this connection there would seem to be no great distinction between the situation of an automobile stalled on the track, as in Texas & N. O. R. Co. v. Goodwin, supra, and men caught in the middle of a narrow bridge over a stream which the train operatives knew to be flooded.

---

[1]"It is complained that the court erred in charging in effect, that the plaintiff could recover although he put himself in a position of danger, if the person in charge of the engine saw him in time to warn him of danger by giving the signal and failed to do it. It is claimed that there was no evidence to warrant this charge. Upon the theory that the jury were bound to believe the fireman, * * * this may be true. But the proof is, that he was upon the engine operating it, and that there was nothing in front of it toobstruc his view of he track. The jury might have presumed from this that he did see the plaintiff." 71 Texas 654, 659, 9 S.W. 546, 547.

The jury could also have concluded within reason that realization at 1040 feet from the point of collision afforded sufficient time within which to have properly slowed down the train to the extent necessary to enable Creech to escape.

Clearly all the additional time that Creech needed was a mre instant — the instant necessary for him to cover, running, the one or two steps separating him and his companion, who actually escaped. The situation was thus quite unlike that of a car stalled on a track, where a full stop of the train would be necessary in order to avoid a collision. Its avoidance was only a matter of deceleration sufficient to afford the additional moment. Evidently the jury did not have to reason that, since conceivably Creech might have fallen in making the last step or two, the time available for avoiding the accident could only be that required for bringing the train to a full stop. Ford v. Panhandle & Santa Fe Ry. Co., supra.

The fireman's estimates as to the distances within which the train might have been fully stopped from a speed of 88 feet per second by the use of the emergency and service brakes respectively, were "evidence" for our purposes, however, unimpressive in point of weight. Assuming, then, that the train could have been stopped within 1250 feet by the use of the one brake and 2500 feet by using the other, the jury was in our judgment entitled to conclude from its own general knowledge that the train could have been decelerated to the necessary extent — at last by reasonably prompt use of the emergency brake — from and after realization of the perilous situation at or about a point 1000 feet ahead of the point of collision.

Some proof as to the process and rate of deceleration in like cases would, indeed, have been appropriate, and there was none; but such proof, at best, would have been but theoretical and not necessarily much more authoritative as applied to this particular train at this particular time and place than the ordinary man's general knowledge of such matters. We think the absence of any such evidence favorable to the petitioners-plaintiff does not foreclose their case as a matter of law. Since the forces of gravity and friction are always operating against the train's motion, whatever its speed, even they alone would seem to cause some instantaneous deceleration, however slight, once the countervailing power of the locomotive has been shut off. Certainly we know that the train, with brakes applied, would not preserve its original speed all the way to the last foot of the potential stopping distance and then decelerate from 60

miles an hour to a full stop in the space of one foot. We see nothing extraordinary in a jury, without aid of further proof, reasoning that if a train can be fully stopped within 1250 feet, it can be substantially slowed below its original speed within the first four-fifths of that distance, that is, within the first 1000 feet after application of the emergency brake.

The jury could have found that "realization" thus occurred in time to have saved Creech by prompt use of the emergency brake, although it should also have believed that the brake was actually applied at the 600 foot point where the fireman said it was. If, with such an actual application of the brake, Creech yet lacked only an instant for escape, it seems merely common sense to conclude that a five second earlier application of it would have been enough to save him. In fact, the jury might well have reasoned just that way — that realization actually occurred five seconds or more sooner than the fireman said it did, but that the brake was applied later, as the fireman said it was, but still too late. The fact that Creech almost escaped, with the brake being actually applied at the later point, would justify the conclusion that there was time to have saved him by applying it at the earlier point where his peril was realized.

■ As to the second principal question — whether the jury had the right to find that the brake was not in fact seasonably applied — we have no great difficulty in concluding that it did. If the jury believed, as it might have, that the brake was applied, but only some five seconds after "realization," that delay in itself would be sufficient ground to uphold the verdict. If it did not so believe, it might well have reasoned that the brake was not applied until considerably later even than the fireman said it was, that is, much later than five second after "realization." The bystander witness testimony was to the effect that the train did not slow down at all prior to the actual collision, and, whatever its weight, it was evidence for the purposes of a "no evidence" case. There was, moreover, the fact that the train did not come to a stop until the locomotive had traveled nearly half a mile from the point where the fireman said the brake was applied and at least 1700 feet beyond the point of collision. Considering also the testimony as to the possible stopping distance of 1250 feet, we think an inference against actual timely application of the brake was justified under Ford v. Panhandle & Santa Fe Ry. Co., supra.

What we have held and said above is, of course, to be understood in the light of the point at issue, which is that of "no

evidence," and has no necessary relation to the question of whether the verdict is against the great weight and preponderance of the evidence, as to which latter this Court has no jurisdiction in any event.

The judgment of the Court of Civil Appeals is reversed in so far as it renders final judgment against the petitioners-plaintiff. However, since the same judgment must also be taken as reversing the judgment of the trial court on the ground that the verdict is against the great weight and preponderance of the evidence, the cause must be remanded to the district court for another trial.

It is so ordered.

The dissenting and concurring opinions filed with our original opinion are withdrawn at the request of the authors thereof, since the original opinion itself is superseded.

Associate Justice Norvell not sitting.

Opinion delivered January 9, 1957.

MR. JUSTICE CULVER joined by JUSTICE GRIFFIN dissenting.

I agreed with the opinion formerly delivered by this Court and nothing contained in the motion for rehearing has caused me to withdraw from that view. In my opinion the disposition made of this case by the Court of Civil Appeals is the correct one. 284 S.W. 2d 256.

Opinion delivered January 9, 1957.

MR. JUSTICE WALKER dissenting.

I would affirm the judgment of the Court of Civil Appeals for the reasons set out in its opinion. 284 S.W. 2d 256.

Delivered January 9, 1957.

Second Motion for Rehearing overruled February 13, 1957.