Lucy Loughry TRAVIS et vir, Appellants,

v.

Wilhemina Dixie VANDERGRIFF et al.,
Appellees.

No. 4294.

Court of Civil Appeals of Texas.

Waco.

Nov. 19, 1964.

Rehearing Denied Dec. 10, 1964.

Touchstone, Bernays & Johnston, Webber W. Beall, Jr., Dallas, for appellants.

Billy J. Moore, Ennis, for appellees.

TIREY, Justice.

This is a tort action wherein appellees recovered judgment against appellants for the death of their father in an automobile accident about May 3, 1963. Testimony was tendered to the effect that the accident occurred on highway 287 (two traffic lanes, one east—one west) approximately one mile west of Ennis, Texas; that appellants were enroute from Corsicana to Fort Worth; that the car driven by Mrs. Travis collided with John Petruy, father of appellees, on such highway, and that Petruy was injured in said accident and died in the hospital in Ennis about thirteen days later. After the parties rested the court presented its charge to the jury containing special issues regarding the primary negligence of Mrs. Travis, contributory negligence of Petruy and dis-

covered peril and damages. The jury found primary negligence and proximate cause against Mrs. Travis, contributory negligence and proximate cause against Petruy, and discovered peril against Mrs. Travis. The court overruled appellants' motion for judgment non obstante veredicto and granted appellees' motion for judgment for the sum of $3727.80 because the jury had found against Mrs. Travis on discovered peril.

■ Appellants' point one is:

"The trial court erred in refusing to grant appellants' motion for mistrial after Wilhemina Dixie Vandergriff injected insurance into the case."

We overrule this contention for reasons hereinafter briefly stated.

Mrs. Vandergriff was the eleventh witness tendered by the appellees in this cause, and her testimony was to the effect that Mr. Petruy was her father; that she was independent executrix of the estate; that she had paid the hospital and doctor bills incurred, as well as the funeral expenses; that her father's eyesight was such that he could see, but not any great distance; that he took normal steps when he walked and did not use a cane; that he could walk but sometimes used a cane; that he kept his cane as some kind of "security stick"; that while she was at his bedside she recognized he was suffering pain, and also testified to the effect that her father had not eaten after he was injured. On cross-examination she testified to the effect that her father died on April 11th; that he walked to town many times; that he was on the way to his daughter's house at the time he suffered the accident, from which he died; that the father did not contribute to her or the other children, but that they contributed some to his support and maintenance. Thereafter, counsel for appellants propounded the following questions to Mrs. Vandergriff:

"Q. Do you recall when you first thought about filing a lawsuit in this case?

"A. Yes, sir, I sure did. When the adjusters came by and offered so little that it was a disgrace, and I thought 'If that is the best they can do, we sure will file suit.' And I am sure they wouldn't want the jury to know what they offered either.

\*    \*    \*    \*    \*    \*

"Mr Beall: We move for a mistrial in the case. He was instructed—(counsel did not approach the bench to make such motion). (Parenthesis ours.)

"The Court: Overrule the objection. I instruct the jury to disregard that part of her answer that was not responsive.

"Q. *So then you hired a lawyer?* (emphasis added)

"A. Mr. Moore had drawn up my parents' wills—

"The Court: Now, you have answered him I think."

Appellants in their brief say:

"This was an unresponsive answer to the question asked and appears to have been premeditated and intentionally made for the sole purpose of advising the jury that the appellants are covered by insurance and to prejudice the minds of the jury against the insurance company.

"Before the commencement of the trial attorney for appellants presented its oral motion in limine requesting the court to order the appellees attorney to instruct the appellees and appellees' witnesses not to mention or otherwise refer to the fact that the appellants are covered by liability insurance, which motion was granted and it was so ordered, \* \* \* but in spite of the express order of the court, Mrs. Vandergriff burst forward unresponsively and advised the jury in no uncertain terms that adjusters had been out to see her in an attempt to settle the case and that the amount of money

offered in settlement was considered by the appellees to be a disgrace. It is bad enough that the appellee advised the jury that the appellants had liability insurance coverage, let alone the additional fact that the insurance company had attempted to settle the case and pay Mr. Petruy's alleged injuries, which is in itself reasonably calculated to inform the jury that the insurance company had, in effect, admitted liability for the injuries.

"The question asked by appellants' attorney calls for a mere 'yes' or 'no' answer. There was no invitation by the appellants' attorney for the witness to add an additional four lines of testimony.

"After this statement was made by Mrs. Vandergriff, appellants' attorney duly and timely moved for a mistrial * * * but the court overruled the motion and merely instructed the jury to disregard that part of Mrs. Vandergriff's answer that was not responsive * * * without having allowed the appellants' attorney to continue his objection."

The statement of facts does not show that appellants' attorney made any effort to stop the witness from further answers at the end of the first sentence when she said, specifically:

"Yes, sir, I sure did."

Nor does it show that appellant excepted to the ruling of the court, nor did he request further instructions from the trial court with reference to the answers made by the witness.

We have made a careful examination of the record as a whole with reference to the error complained of, and we are of the view that appellants have not carried their burden under Rules 434 and 503, Texas Rules of Civil Procedure. In Walker v. Texas Employers' Insurance Association, 155 Tex. 617, 291 S.W.2d 298, we find this statement:

"The rule of 'presumed prejudice' has not prevailed in this state since the adoption of Rules 434 and 503, Texas Rules of Civil Procedure, in 1941. Aultman v. Dallas Ry. & Terminal Co., 152 Tex. 509, 260 S.W.2d 596, 600."

In the case at bar Mrs. Vandergriff, one of the plaintiffs, was being interrogated on cross-examination by appellants' counsel with reference to the question as to when she first thought about filing this lawsuit; that question was wholly immaterial and irrelevant as to the cause of the injury, as to the liability, and as to the amount of damages. It does not appear from the record just what counsel for appellants had in mind in asking the question. We think it fair to assume, although it is not shown by the record, that counsel knew that Mrs. Vandergriff had been contacted by appellants' adjuster, and that the adjuster had failed to make a settlement. This suit had been filed prior to September 17, 1963, and the cause came on for trial on the 30th day of March, 1964. Under the record it is fair to assume that counsel had known for some time that Mrs. Vandergriff had been in consultation with her attorney concerning this matter, and as to the time she decided to file this suit was wholly irrelevant to any issue in the case and was solely a matter of privilege between Mrs. Vandergriff and her counsel, and the inquiry of counsel with reference thereto was an invasion of the privilege she enjoyed by having employed counsel. The first sentence in the answer of the witness was in direct response to the question asked. The record does not reveal that counsel made any attempt to interrupt the witness after she had answered the question directly. After she had finished counsel made his motion for mistrial, and the court gave the instruction previously stated. After the court's ruling counsel then asked, "So then you hired a lawyer?"

And the witness answered, "Mr. Moore had drawn up my parents' wills." At that point the court interrupted the witness and told her she had answered his question. We think it is obvious from the record that counsel compounded the error complained of in open court in the presence and in the hearing of the jury in failing to approach the bench and make his motion, and we are of the further view that he further compounded the error when he asked the above question. We have given much consideration to the error here complained of and after considering the whole record we are of the view that the answer of the witness complained of was without any impact on the question of liability, because the jury convicted Petruy of negligence. We likewise think it was without any impact upon the award the jury made for pain and suffering, because the sum awarded was $2850.00, and plaintiffs had sued for $15,000.00. There was evidence that Petruy suffered great pain, and there is no complaint that the sum awarded is excessive. That leads us to say that it is our view that since the court instructed the jury to disregard that part of the witness's answer that was not responsive to the question, that appellants have failed to carry their burden under Rules 434 and 503 T.R.C.P., aforesaid, and point 1 is overruled. See also Cloud v. Zellers, 158 Tex. 253, 309 S.W. 2d 806, and Condra Funeral Home v. Rollin, 158 Tex. 478, 314 S.W.2d 277; Collins Construction Co. of Texas v. Taylor, Tex.Civ.App., 372 S.W.2d 548, n. r. e.

Appellants' points 2 through 31 complain of the action of the trial court in submitting the special issues on discovered peril and in refusing to set aside the jury's answers to said issues and grant judgment N.O.V. for appellants. Appellants contend that the evidence "does not warrant the submission and does not support the findings of the jury on the doctrine of discovered peril because there is no evidence, no sufficient evidence, and no competent evidence that Mrs. Travis discovered the perilous position of Mr. John Petruy in sufficient time to have avoided the collision with Mr. John Petruy by the exercise of ordinary care. Special issues No. 17 through 21 inquire only into the conduct of Mrs. Travis. There are no special issues inquiring into the conduct of Mr. Travis. This involves three basic questions:

"1. Was Mr. Petruy in a position of peril, and if so, when and where did he get into a position of peril,

"2. Did Mrs. Travis realize that Mr. Petruy was in a position of peril, and if so, when and where did she so realize,

"3. If Mrs. Travis did realize that Mr. Petruy was in a position of peril did she, as a matter of law, thereafter have sufficient time to avoid colliding with Mr. Petruy."

Our Supreme Court in Ford v. Panhandle & Santa Fe Ry. Co., 151 Tex. 538, 252 S.W.2d 561, 562, said:

"(2) The quantum of proof required of the plaintiff on these elements of discovered peril in order to entitle him to have them submitted to the jury was such facts and circumstances as taken together with all reasonable inferences therefrom constituted some evidence of probative force of their existence. (citing cases.)

"(3) In determining whether the plaintiff discharged this burden we must view and interpret the evidence in the record in its most favorable light to the plaintiff, disregarding all evidence and the inferences therefrom favorable to the defendant." (citing cases).

The first question that confronts us is whether the evidence shows conclusively

that Mrs. Travis exercised ordinary care in the use of all means at hand to avoid injuring Petruy. Or, are there such facts and circumstances in the record viewed most favorably to the plaintiffs, which with all reasonable inferences therefrom, entitled the plaintiffs to have the issue of discovered peril submitted to the jury? We think so. There were four eye witnesses to the accident, Mrs. Travis and her husband, George Cook and his younger brother; only Mrs. Travis and her husband and George Cook took the stand. George Cook testified to the effect that he and his brother, Roy, saw the collision; that the sun was shining; that as they came over a little rise in the highway they saw a person crossing the highway; that they were going in an easterly direction from Waxahachie to Ennis, and that after they got near the top of the rise in the highway he saw just the head of the traveler and that as he got higher he saw the man crossing the highway from his right to his left; that the man was hobbling slowly with a cane in hand across the highway; that he immediately slowed his speed but had to veer to his right onto the shoulder of the road some six feet and to the man's rear to miss him; that as he passed him the man did not look up and did not see him, and that he kept walking across the highway; that as he passed the man he looked down the highway and saw a car coming toward Waxahachie in the opposite traffic lane; that after he passed the man he could see how slowly he was walking, and saw the car coming and he said to his brother that the car was going to hit the man unless he either stepped up his pace or the car slowed down; that looking through the rear view mirror he saw the car strike the man and knock him into the air; that the man was visible all the time after he passed him; that he made a U turn and drove back up to the scene of the accident and pulled off the shoulder to the right, and that his brother ran to the old man to assist him in any way he could; that when he got to the scene of the acci-

dent he saw that Mrs. Travis was driving, and she was getting out of the car and that she was hysterical and in a state of shock; that she said, "I didn't intend to hit the old man."; that the car was in a braking position when it struck the man, and there were skid marks on the highway just as straight as they could be in that lane; that he was there when the ambulance came from Ennis, and it came around on the right side of Mrs. Travis' car, and was on the right shoulder; that the left front of Mrs. Travis' car struck the man; that the car was traveling within the normal speed limits on the highway at the time he saw it; that after the collision the man was lying in the highway just about in the middle, and that his head and shoulders were probably past the center line of the highway and the balance of his body over in the other lane of traffic; that he was probably 400 or 500 feet down the highway when the man was hit and that the man was hit in the west traffic lane, approximately two feet north of the center line; that there was nothing to keep Mrs. Travis from seeing the man.

Mrs. Travis testified to the effect that as she came up the incline coming out of Ennis that she saw the man when he was on the shoulder of the road before he crossed the highway. She also testified that she saw him right in the middle of the highway; that she did not turn either to the left or to the right; that when she first saw him he was standing still on the dividing line, and that he jumped in front of her, and that she thought it would be 40 or 50 feet from where she was in the car; that she was going 30 miles per hour when she left Ennis, and that she got up to between 40 or 50.

Mrs. Travis testified specifically:

"Q. * * * You said now that you saw * * * Mr. Petruy when he was over here before he crossed the highway, is that correct?

"A. Yes, sir.

"Q. At that time he was on the shoulder of the road?

"A. Yes, sir.

"Q. I believe you said you were back down here somewhere?

"A. Yes, sir.

"Q. And you had come over the hill and you saw him, is that correct?

"A. Yes, sir.

"Q. And then at that time did you think that there was going to be any kind of accident?

"A. I never dreamed.

"Q. That there would be an accident?

"A. No, I never dreamed of such a thing.

"Q. After that did he start to walk across the highway?

"A. Yes, he skipped, he was skipping.";

that he did not go straight across the highway, but crossed at an angle.

Mr. Travis testified to the effect that he was sitting in the front seat on the right side of the driver; that the windshield was clean; that when they first saw the deceased he was on the shoulder and that he was walking at about a sixty degree angle; that he was not going across the road at all when he first saw him; that he was watching the man; that he had a stick in his hand, and that he was very low and was walking just as fast as he could; that he estimated that they were 300 feet from the man when he first saw his head as they came up the hill; that the man never turned his head and did not look our way or in any direction. Mr. Travis testified specifically:

"Q. Now my question is, from this point here where she started her skid, did she anywhere back down the line here after she saw him, did she slow down any?

"A. Yes, sir, she slowed up, I told you that, but I couldn't say how much. She seen the man and I know that she is bound to. Something happened, you know, to make her think and she stepped on—she didn't step on the brakes but she slowed the car down.

"Q. In other words she slowed the car down before you told her, 'Honey you are going to hit him in spite of hell'?

"A. Yes, sir, she slowed the car down before I told her to get on the brakes."

It is our view from a careful analysis of the foregoing testimony and all the facts and surrounding circumstances in this cause, that the evidence tendered is sufficient to take to the jury the issue of discovered peril.

Going back to the witness Cook's description of the accident, we think his testimony will support a conclusion by the jury that as he passed Mr. Petruy, that he had left the shoulder of the road, and was walking slowly with his head down with a cane in hand, and that he was going in a direction to cross into the north traffic lane in which Mrs. Travis was traveling, and that he was not looking in either direction and that it also supports Mrs. Travis' testimony, as well as the conclusion by the jury that Mrs. Travis had seen Mr. Petruy while he was on the shoulder of the road, and saw him crossing, or attempting to cross, walking with his cane, with his head bowed low, unconscious of approaching traffic, and that in such situation Mr. Petruy was in a position of peril before he reached the center line in the highway. It is true that the highway was wide, but it had only a stripe in the center dividing the highway into two traffic lanes. We are of the view that the testimony tendered is sufficient to support the con-

clusion by the jury that Petruy was in a position of peril at the time he started to cross the road, with his head bowed low, and without looking either way in the direction of approaching traffic, and that Mrs. Travis discovered his perilous position in time to have avoided striking him by the use of the means at her command if she had exercised ordinary care. It is our view that when Mr. Petruy started across the highway, without looking in the direction of the approaching car driven by Mrs. Travis, and that since Mrs. Travis saw him in such position, that it was a circumstance sufficient to apprise her that Mr. Petruy was unobservant and was in danger of his course and position, and having seen Mr. Petruy under such circumstances it was her duty to exercise ordinary care in the use of all means at her command, consistent with the safety of herself, her car and her passengers, to avoid injury to Mr. Petruy, and this she failed to do. See Parks v. Airline Motor Coaches, 145 Tex. 44, 193 S.W.2d 967. We are of the further view that the jury could have concluded from the evidence and all the surrounding facts and circumstances that Mr. Petruy was in a position of peril when he left the shoulder of the highway and started across the highway with his head bowed low, walking with the cane, and not looking in either direction for approaching traffic. There is evidence to the effect that Mrs. Travis and her husband both saw Mr. Petruy when he left the shoulder and started across the highway. It is without dispute that the car driven by Cook passed to the rear of Mr. Petruy while he was in the south traffic lane or the traffic lane for traffic moving in an easterly direction, and that Mrs. Travis saw him walking with a cane with his head bowed low not looking in any direction before he reached the traffic lane in which she was traveling, and that under these undisputed circumstances that Mrs. Travis realized the perilous position that Petruy was in before he reached her traffic lane. In the Ford case, supra, the court said:

"If a pedestrian were never in a position of peril until he took the last step placing himself in front of a moving train or vehicle, then he could never recover under the doctrine of discovered peril because until he took the last and final step it lay in his power not to take it."

We think the above statement is peculiarly applicable to the factual situation here. See also Creech v. Thompson, 156 Tex. 561, 297 S.W.2d 817; R. T. Herrin Petroleum Transport Co. v. Proctor, 161 Tex. 222, 338 S.W.2d 422. In Texas and New Orleans Railway Company v. Hart, Tex., 356 S.W.2d 901, we find this statement:

"To raise the issue of discovered peril here, it was only necessary for the plaintiff to show that the defendant realized, in time to have avoided the collision, that plaintiffs were in a position of peril, and were pursuing, and probably would continue to pursue, a course that was likely to result in their being injured."

We think the foregoing statement is peculiarly applicable to the factual situation here. That leads us to say that we are of the view that the testimony is ample to raise the issue of discovered peril, and that it is likewise ample to sustain the answers of the jury thereto. We are of the further view that none of the jury's answers are against the great weight and preponderance of the evidence.

Accordingly, appellants' points 2 to 31, inclusive, are overruled, and the judgment of the trial court is affirmed.

WILSON, J., concurs in the result.