E. O. PREWITT, Guardian, et al., Appellants,

v.

M. V. WATSON, Appellee.

No. 6776.

Court of Civil Appeals of Texas.

Amarillo.

Oct. 27, 1958.

Rehearing Denied Nov. 24, 1958.

Spafford, Spafford, Freedman, Hamlin, Gay & Russell and Warren Whitham, Dallas, for appellants.

Renfro & Johnson, Dallas, for appellee.

CHAPMAN, Justice.

E. O. Prewitt, guardian of the person and estate of Mrs. W. F. (Nettie) Allison, a person of unsound mind instituted this suit at the direction of the Probate Court of Dallas County to cancel and set aside a deed from the said Nettie Allison dated April 23, 1955, to M. V. Watson, appellee, upon the allegation that at said time she was a person of unsound mind. At the time of the purported conveyance Mrs. Allison was 94 years of age, living alone, her only husband having died many years previous thereto.

On September 6, 1955, appellant was appointed receiver of the estate of Mrs. Allison, on September 19, 1955, he was appointed guardian of her person and estate, on January 5, 1956, he was directed by the Probate Court to bring this action against appellee and the original petition was filed January 23, 1955. The case was tried on May 7, 1957, while Mrs. Allison was a patient at the Recovery Center, in Dallas, where she died on May 19, 1957.

The case was submitted to a jury, which found that Mrs. Allison had sufficient mental capacity to understand the nature and effect of her action in making the deed and that appellee gave Mrs. Allison $3,000 for the land. Appellant is before us upon two assignments of error which assert (1) the verdict of the jury and the judgment of the court are so contrary to the great weight and preponderance of the evidence as to be manifestly unjust and (2) the court erred in refusing to grant a new trial because of improper argument of appellees' counsel. Under our view of the record only the first assignment is necessary to a disposition of the case.

E. O. Prewitt, appellant, a funeral director of Dallas, Mrs. E. L. Prewitt, his sister-in-law and I. Walton, a retired farmer and a former member of the board of school trustees at the little town of Kleberg in Dallas County, all three of whom had known Mrs. Allison most of their lives, testified in effect that she did not have sufficient mental capacity on April 23, 1955, to understand the nature and effect of her action in making the deed in question. The knowledge of her habits, conduct, expressions and peculiarities, and the observations of the deterioration in her mental capacity as she reached her extremely advanced age, testified to by the three witnesses just named, constitute strong corroborated evidence of the senile dementia Dr. Joseph Knapp, a physician specializing in psychiatry and a fellow of the American Psychiatric Association testified she was suffering from at the time he examined her on September 15 and September 22, 1955. Dr. Knapp's professional background shows him to be highly qualified to make the examinations of Mrs. Allison that he was called on to make and from which he testified as follows:

"Q. Now, you say you made two examinations; what were your findings and what was your diagnosis? A. The patient was an elderly white female, pretty well confined to bed continuously, extremely restless, very confused, she had a large bed sore on the lower part of her back. Her conversation for the most part was rather rambling, she didn't know where she was, she did not know her age, she did not recognize the nurse who had been with her for the past three or four days, she mis-identified me as an old friend, she would be pleasant and affable, and very jovial, and go then to the point of almost breaking into tears; she could be heard not only in the room, but in the corridor of the hospital, periodically yelling. Her answers to almost anything that you talked to her about was, 'I don't know, I don't remember.'

"It was my opinion that she was suffering from a senile dementia, or a type of mental illness produced by advanced years. In addition, I felt that she showed every indication of having rather far-advanced hardening of the arteries which is not uncommon at her age."

"Q. What is the effect, Doctor, so-called hardening of the arteries, that is commonly called *ateriosclerosis*, don't you? A. Yes, sir.

"Q. All right, now, what is the effect of that, Doctor: what effect does the hardening of the arteries produce? A. The hardening of the arteries, when sufficiently advanced, do cause some impaired circulation, in other words, the inside diameter of the blood vessels decreases in size as well as losing its normal elascity and produces degenerative changes due to lack of oxygen and due to lack of proper nutrition in the various tissues. This is particularly true of the brain.

"Q. What happens to the brain in that advanced stage? A. There is a definite decrease in size and a deterioration of the brain tissues.

"Q. Will it produce atrophy? A. Yes, sir.

"Q. And what is an atrophy, tell the jury what that is? A. Well, an atrophy is a deterioration—or the best word, a deterioration of the brain substance.

"Q. Well, it causes shrinkage of the brain? A. Yes, sir.

"Q. What did you find out about her judgment, Doctor?

"Mr. Renfro: Your Honor, that calls for a conclusion.

"The Court: It will be overruled.

"A. The patient showed very impaired judgment to me, in view of the fact that she did not know where she was, how long she had been there, who the people were that were there, taking care of her, who I was, even though I had explained to her who I was, and three or four minutes later she would again be completely forgetful and in answer to almost every question would say, 'I don't know, I don't remember.' It was repetitious, 'I don't know, I don't remember.'

"Q. Now, Doctor, based on your examinations on those occasions and the diagnosis, that you made, could you tell whether that condition had existed five months, we will say, prior to those examinations? Could you form an opinion on that? A. In view of the fact that this is a gradual progressive type of illness, it would be my opinion that the patient had this condition to a serious degree at least for five months previously, yes."

Mr. Prewitt, the guardian was directed by the Court to clean up Mrs. Allison's home. He testified in effect that anyone with a sound mind would not live under such conditions.

"Q. All right, now, what condition did you find that home in? A. Well, it was just full of debris. We hauled ten loads of debris out of the house, ten truckloads."

His testimony further showed in effect that she had a hen that roosted over a dresser in one room of her home which he thought had been roosting there for about five years. This testimony was in part corroborated by Mrs. Prewitt.

Warren Whitham, attorney for the guardian was present at the latter's request and observed the cleaning of the debris from the home. His testimony developed the fact that the "truckloads" of debris testified as having been hauled from the house were pickup truckloads with sideboards on the pickup. His testimony in effect was that the debris had accumulated to the extent that the odor was almost nauseating. They searched all the old boxes, barrels and buckets with trash and rubbish that were piled from knee deep to chest deep over the house. This witness said, "These boxes would have all matter of rubbish and trash in them; there would be a dollar bill here or a five dollar bill and old checks scattered, some of them that would be years old. She—apparently she had a bowel movement inside the house and it would be wrapped up in a piece of old newspaper and stuffed in these boxes. We ran through that condition from the time we entered the door until we got through." He further testified:

"Q. Now, what did you find out there in the way of assets? A. I don't have the exact sum. In the house, itself there was—let's see—counting the checks that Mr. Walton handed to us as soon as we came out there, the money he had, counting that money, several dollars they took off of her person at Parkland Hospital when they took her to Parkland, and that, together with loose change and dollar bills and denominations of different amounts, and old checks that we found in there that we could redeem, came to something about $900.00, something around that. I don't have the exact figure."

Mrs. Woodruf and Mrs. Lewis testified in their opinion, from observing Mrs. Allison she was of sound mind. Mrs. Woodruf admitted * * * "Mrs. Jones told me that she (Mrs. Allison) did make her will and she remembered me in her will a lot."

Mrs. Lewis, a neighbor but of no relation to Mrs. Allison admitted that of the three tracts of land owned by Mrs. Allison in addition to that involved in this controversy, she and her grandson, Forest Ledbetter Jr. have a deed together to one tract and her son, Forest Ledbetter, has a deed to the other two tracts. She further ad-

mitted that she acquired some corporate stock of Mrs. Allison's in Southern Union Gas Co.; all her interests but one share in Arkansas Western Gas Lines: that her heretofore named grandson acquired $1,000 worth of stock in First Federal Savings and Loan Association in Dallas, that none of them paid anything for any of the property mentioned and that suits are now pending to cancel the transactions. The testimony does not show the extent of Mrs. Allison's relatives but it does mention a nephew and a niece who lived in Jasper, Texas.

None of the other witnesses used by appellee, the Notary Public who took her acknowledgement to the deed in controversy, Mrs. Hurley and Mrs. Smith who had lived in Kleberg, nor the attorney, Kenner W. Clay, attempted to testify to Mrs. Allison's sanity.

The record shows appellee acquired the land without an examination of the title, without legal advice, and that he wrote the deed out himself in longhand from the records he found in the Clerk's office. He testified in effect that he paid in cash the $3,000 shown as consideration and that no check was given for any of it, though he carried an account at the Mercantile Bank in Dallas at the time; that $300 of the $3,000 paid was taken out of his pocket by him; that his brother-in-law, B. D. Hunt of El Reno, Oklahoma, let him have $2,-000 of the payment which was handed to him in 10 and 20 dollar denominations and that though Hunt carried a bank account he did not check on it for any of the $2,000; that his father, also of El Reno, did not even have a bank account but he let him have $700, in 10, 20 and 50 dollar bills to apply on the payment. Not a dollar of the $3,000 purportedly paid could be traced to a record.

Olen Glenn, a real estate agent who had been engaged in that business in Kleberg in Dallas County for eight or ten years, who had lived there all his life and had traded land ever since he was grown testified he sold a 52-acre tract close to the land here in controversy for $500 an acre, a 5-acre tract just across the road from Mrs. Allison for $350 an acre and that the 50 acres acquired by appellee was worth $250 an acre, or $12,500.

Appellee offered Mr. Morton, a real estate man who lives at Lancaster and whose real estate operations were mostly around Lancaster, Wilmer, and Hutchins, who testified the land under consideration in this case was worth about $60 or $65 an acre.

Appellant introduced in evidence and brought forward to us fifteen pictures taken of the inside of the home showing the conditions under which Mrs. Allison was living during the last years of her life. The pictures show such squalid, disheveled and filthy living conditions, especially when considered in connection with the testimony of Messrs. Prewitt and Whitham, as to make this writer question how anyone could stay alive for very long under such conditions, much less live in them while sane.

■ From the record made in this case it becomes the duty of this court to weigh and consider that which supports the verdict and that which does not, and to set aside the judgment and remand the case if after such consideration we conclude the verdict is so contrary to the overwhelming weight of all the evidence as to be manifestly unjust, regardless of whether there is some evidence to support it. In re King's Estate (King v. King), 150 Tex. 662, 244 S.W.2d 660; Purvis v. Morehead, Tex. Civ.App., 304 S.W.2d 221; Chantly v. Chrystal, Tex.Civ.App., 274 S.W.2d 765.

■ There is no indication or reason whatever to think, from the record in this case, Dr. Knapp would have any motive as a witness except to tell the truth. Certainly his training makes him the best qualified of any witness to relate the condition of Mrs. Allison. Two other witnesses, Mr. I. Walton and Mrs. Prewitt, whom the record shows could not benefit

in any manner from an adjudication of mental incapacity and who had known the lady intimately for 50 years or more corroborated completely the Doctor's diagnosis, or perhaps it might be better said that the Doctor's diagnosis corroborated their testimony. When the testimony of these three just mentioned is added to the testimony of Mr. Prewitt and Mr. Whitham and considered in connection with the exhibits in the case, then weighed alongside the testimony offered by appellee, we can come to only one conclusion, which is that the verdict of the jury and judgment of the court are so against the great weight and preponderance of the credible testimony as to be manifestly unjust.

█ The record reflects that much controversy existed in the trial below as to the proper method of proving the mental condition of Mrs. Allison at the time the deed was purportedly executed. In view of another trial we believe it might be helpful to the attorneys to cite the approved rule to follow in interrogating witnesses as to the mental capacity of a person whose actions are questioned. The landmark case is that of Brown v. Mitchell, 88 Tex. 350,

31 S.W. 621, 36 L.R.A. 64. A full discussion was made by Judge Brown of that court. Later, in Chambers v. Winn, 137 Tex. 444, 154 S.W.2d 454, 455, our Commission of Appeals, in an opinion approved by the Supreme Court has quoted with approval from other authorities in spelling out a proper method to be followed in making proof in a case of the nature of the one here under consideration, as follows:

"We understand the rule to be that witnesses, whether experts or laymen, may, having first stated their observation or knowledge of the habits, conduct, expressions, peculiarities, disposition, temper, or character of the person, in turn may give their opinion as to whether he was mentally capable of knowing or understanding the nature and effect of his acts, etc., as distinguished from his opinion as to whether the testator possessed the degree of intelligence to do what he did do."

It follows from what we have said above that the judgment of the court below is reversed and remanded.