**TEXAS EMPLOYERS INSURANCE ASSOCIATION, Appellant,**

v.

**Dona BROWN et al., Appellees.**

**No. 7709.**

Court of Civil Appeals of Texas.

Amarillo.

April 24, 1967.

Rehearing Denied May 22, 1967.

Nelson & Sherrod, Wichita Falls, for appellant, David A. Smith, Wichita Falls, of counsel.

Peery, Wilson & Jameson, Wichita Falls, for appellees, Norman Whitlow, Wichita Falls, of counsel.

CHAPMAN, Justice.

This case for death benefits under the Workman's Compensation Act was instituted by Dona Brown, individually and as next friend for Laura Jo Brown and Billy Jack Brown, surviving widow and children respectively of W. A. (Dub) Brown, deceased. The latter lost his life between 12:-

:00 and 1:00 o'clock p.m., on June 10, 1965, when his pickup truck collided with a Fort Worth & Denver train in Harold, Texas. The deceased was at the time proceeding in a northerly direction.

In response to Special Issue No. 1 the jury found that Brown's fatal injuries were sustained while he was acting within the course of his employment for Oilfield Employees, Inc. Judgment on the verdict was rendered for plaintiffs. Appeal is perfected to our court in "Point One" upon the contention that there was no evidence to support the verdict and judgment based thereon that W. A. Brown was, at the time of his death, acting within the course of his employment. In the only other point, the question is raised that requires us, if we reach it, to pass upon the overwhelming preponderance question.

Oilfield Employees, Inc. is a company owned by H. C. Leach, Warren Pruitt, and perhaps others, and which furnishes mechanical labor and equipment to other companies on a contract basis. Dub Brown was not a member of any particular operating crew but worked principally as an individual mechanic for said company. As an oilfield mechanic he worked both in the company shop in Vernon and in the oilfields to maintain equipment. He was on 24-hour call, and worked by the hour at the rate of $1.75 per hour with time-and-a-half for overtime, owned his own pickup, furnished his own fuel and upkeep for it, but was paid $75.00 per month by the company for its use regardless of how many miles he drove it. He was free to use it for any purpose unconnected with his employment.

In emergencies in the field when the company would take the mechanics' food, and when one would eat while two worked and they ate hurriedly, the company did not dock them for their time in eating. Otherwise, when the employees were in the field and took off for lunch to either go to a nearby store for food, or home, or to eat lunch they brought with them, they were not paid for that period and were on their own time. The company paid for road time to and from work but not in going to eat.

"Q. Do you allow road time for a mechanic when he goes to lunch?

"A. Well, we don't allow road time for any of them.

\* \* \* \* \* \*

"Q. All right. Now, lunch time is not road time, is it?

"A. Not during the lunch time, no.

"Q. Now, if this man had taken off to come to Vernon, the end of his work out there, to go home to go to sleep, would he be paid for the time he is traveling on the road?

"A. The time that he is traveling on the road, he would be paid, to and from the job.

"Q. To and from the job?

"A. Yeah.

"Q. But on this occasion, if he was going to lunch, what about lunch time?

"A. No, if he was going to lunch he wouldn't be paid until he got back on the job."

The record shows that Hoyt Lee was working on a rig on Miller Brothers Lease on June 9, 1965. He knocked the bearings out of some machinery and had Dub come out to the field to check it. They tore it down, took it to town, and he and Dub worked on it until 4:00 or 5:00 o'clock the next morning. Hoyt Lee took the repaired machinery out to the field early the next morning and after a few hours sleep, Dub checked back at work by punching the time clock at the office at 9:48. He thereafter left and drove out to the Miller Brothers Lease to check on the machinery they had repaired the night before, arriving there between 10:00 and 10:30 o'clock a. m. He did some more work on the unit and left five or ten minutes after 12:00. The pan was still leaking oil and Dub told Lee as he left

to keep a close watch on it, and if anything happened he could reach him by radio, a two-way radio unit the company furnished for the pickup and which he kept on at all times when he traveled from the shop to the field and back. The manager of the company, Mr. Leach, testified he did not expect any of them to keep their two-way radio on at the lunch hour, though it appears from the record that at times Dub Brown did so.

Before leaving Vernon on the morning of the fatal day Dub had coffee in a cafe with a good friend, Paul Chambers, of Electra. Their families are good friends, had eaten in each others homes, and Chambers invited Dub to have lunch with him that day since he was going to be at Grayback to check a rig. Dub told him if he did not have any troubles he would try to join him at his home for lunch.

Another person shown in the record to have talked with Brown that morning was Arlen White, an oil well pumper on the Miller Lease. He was at the time about 2½ miles north of Grayback at the "Dog House." After first talking to him Dub went and did some more work on the machinery he had worked on the night before then came back by the "Dog House" where White was. White said it could have been a little after 12:00, " * * * I couldn't say what, but it was right at 12:00." Dub told him he was going to Electra " * * * to eat a steak dinner with Paul Chambers." White also remembered Dub saying there was something he was going to do with respect to work but he did not remember if it was going to be before lunch or after lunch.

On the day in question Orville Talley was also working for Leach. He and the two members of his crew were working on the City Service Lease. They took off for lunch and went to the shade of a warehouse building at Grayback to eat their lunch. Dub Brown came by at about 12:20 and serviced his pickup with butane owned by the company. Talley told him the first chance he had he ought to catch up on his rest. His reply was, "Okay * * * I'll see you." As he left about 12:35 he had on both his music playing radio and his two-way radio. Talley did not see which road Dub took but there were two roads approximately the same distance to Electra—one by Harold and one called the "Lower Road." Neither of them would have been the direct road to Vernon, the most direct route to his shop and home being via Waggoner Ranch Zacaweista Headquarters and onto Highways 183 and 283, a paved road from Seymour to Vernon. Dub's wife testified that is the road she would have taken going from there to Vernon.

There was no set time as to how long Brown could take off for lunch. He could take off as long as he wanted to and if he was working where the time clock was not available he would later go by the office and write in the time.

As we view the problem before us it is to interpret Article 8309, Section 1, and the 1957 Amendment thereto, Section 1b of Vernon's Texas Civil Statutes, as those statutes apply to the facts of our case and as they have been construed by the Supreme Court of Texas.

"Definitions" under Section 1 of Article 8309 provides: "The term 'injury sustained in the course of employment,'" * * * "shall include all other injuries of every kind and character having to do with and originating in the work, business, trade or profession of the employer received by an employee while engaged in or about the furtherance of the affairs or business of his employer whether upon the employer's premises or elsewhere."[1]

Section 1b of Section 1 of Article 8309, the 1957 Amendment above referred to, has two parts. There is no controversy here concerning the first part of Section 1b of

1. Beginning with the second word of the third line of the second numbered "(4)" paragraph of Article 8309, Section 1.

Article 8309. The second part deals with what has been referred to as the "dual purpose" rule.[2] Thereunder, and as applicable here, injuries occurring during travel for the dual purpose of furthering the affairs or business of the employer and the employee's personal or private affairs shall not be deemed in the course of employment and compensable, "unless the [Dub Brown's] trip * * * [to Harold] would have been made even had there been no personal or private affairs of the employee to be furthered by said trip, and unless said trip would not have been made had there been no affairs or business of the employer to be furthered by said trip."

The Supreme Court of Texas has held that by the Section 1b 1957 Amendment to Section 1 of Article 8309 "* * * the Legislature intended thereby to circumscribe the probative effect that might be given to the means of transportation or the purpose of the journey rather than to enlarge the definition found in Section 1." Texas General Indemnity Company v. Bottom, 365 S.W.2d 350 (Tex.1963); Agricultural Insurance Co. v. Dryden, 398 S.W.2d 745 (Tex.1965).

The Supreme Court of Texas has also held that the direction to proceed from one place to another place of which Section 1b speaks, can be an implied direction. Jecker v. Western Alliance Insurance Company, 369 S.W.2d 776 (Tex.1963). "But by the very language of the section the implied direction to the employee must be 'in his employment,' and the travel thus must be in the furtherance of the business of the employer." Janak v. Texas Employers' Insurance Association, supra. There is not any probative evidence in this record that would justify an implied direction to go by Harold or to Electra or that doing so furthered the business of the employer.

█ As heretofore stated, both the no evidence and overwhelming preponderance

questions are raised by appellant's brief. In considering the former: "We may consider only that evidence, if any, which, viewed in its most favorable light, supports the jury findings, and we must disregard all evidence which would lead to a contrary result." Biggers v. Continental Bus System, 157 Tex. 351, 303 S.W.2d 359 (1957). See also Creech v. Thompson, 156 Tex. 561, 297 S.W.2d 817 (1957); Barker v. Coastal Builders, 153 Tex. 540, 271 S.W.2d 798 (1954); Maryland Casualty Co. v. Hearks, 144 Tex. 317, 190 S.W.2d 62 (1945).

We thus have the narrow question as to whether Brown would have traveled via Harold on the occasion had there been no personal or private affairs of his to be furthered thereby and if said trip would not have been made had there been no affairs or business of the employer to be furthered by said trip. Article 8309, Section 1b.

It is without question in the record that when Brown left Grayback at 12:45 p. m. he deviated from the shortest, best and most practical road to his home and the company's shop at Vernon when he went by Harold.

Proof shows it was the custom of Brown to have his two-way radio on as he traveled. The last person to talk to him before his death, Orville Talley, was listening to his own two-way radio from 12:35 p. m. until Brown's death and he heard no message to or from Brown. Hoyt Lee, in charge of the machinery Brown and he had worked on the night before, made no call to him after he left that morning.

Appellees also proved that Leach, one of Brown's employers, had a lease between Grayback and Harold but the record is silent as to any work or inspection of any machinery on said lease by Brown after he left Grayback on the day in question.

Appellees also proved that Leach had done some work for Brown's father-in-

2. Janak v. Texas Employers' Insurance Association, 381 S.W.2d 176 (Tex.1964) Syl [2].

law, Melvin Pate, prior to June 10, 1965, on which the work orders had not been signed and that sometimes Brown secured Pate's signatures on such work orders. This was obviously for the purpose of attempting to prove Brown was on the way to Pate's home at Harold at the time he was killed in order to get such work orders signed. However, the record is silent as to Brown's having any such work orders in his possession at said time, Mr. Pate could not recall if Leach's company had done any work for him within the last month, and Mr. Pate testified Leach sometimes sent such work orders to him by mail.

There was also proof that there is a garage in Harold and an inference was sought to be made that Brown may have purchased supplies in behalf of the company there at some time and went by Harold for such a purchase at the garage that day. Mr. Leach admitted it was possible Dub had made a purchase there at some time but stated that he knew of none. He testified he could find out by checking his records but he was never asked to do so.

Mrs. Brown testified she had cooked lunch for Dub and called the office dispatcher at about 11:30 and told him it was on the table for him but she had to go to Electra to a birthday party and take the children. There is no evidence that Mr. Dally, the dispatcher, ever contacted Dub to give him that information or that he would have gone to Vernon to eat had Dally called him.

There is evidence that the deceased was given his time by the company for work up to the time of his death, but a careful reading of Mr. Leach's testimony shows it was not because he considered Dub was in the course of his employment at the time but more of a courtesy or gratuity in view of the fact that he had been killed after having worked most of the night before. When asked if Dub was on his (Dub's) time if he had taken off from his work there at

the Miller Lease and was going to Electra for lunch, Mr. Leach answered, "Definitely."

Even when we consider only that evidence, if any, which, viewed in its most favorable light supports the verdict and disregard all evidence which would lead to a contrary result, there is still only conjecture and surmise that Dub was at the time of his death in the course of his employment. It is unrealistic to assume that he would go by Harold, a longer distance and less practical road, if he was at the time he was killed in Harold on his way to Vernon to rest, to eat, or to go back to work at the shop. The record is simply without probative evidence that he met either condition of the two-pronged test of Section 1b of Article 8309. Accordingly, we hold the motion for directed verdict made by appellant at the close of the testimony should have been granted.

If the Supreme Court of Texas should disagree with our understanding of the facts as applied to that court's construction of Section 1b of Article 8309 announced in the cases we have cited construing it, then we say we would sustain the "insufficient evidence" point raised in the record. To do so:

"* * * becomes the duty of this court to weigh and consider that which supports the verdict and that which does not, and to set aside the judgment and remand the case if after such consideration we conclude the verdict is so contrary to the overwhelming weight of all the evidence as to be manifestly unjust, regardless of whether there is some evidence to support it. In re King's Estate (King v. King), 150 Tex. 662, 244 S.W.2d 660; Purvis v. Morehead, Tex. Civ.App., 304 S.W.2d 221; Chantly v. Chrystal, Tex.Civ.App., 274 S.W.2d 765." Prewitt v. Watson, 317 S.W.2d 954, (Tex.Civ.App.–Amarillo, 1958), Approved Per Curiam, Watson v. Prewitt, 159 Tex. 305, 320 S.W.2d 815.

Dub Brown told Paul Chambers in the cafe on the morning of the day he was killed that he would try to have lunch with him that day if he did not have any troubles. He did not have any troubles before his death to prevent his luncheon engagement so far as this record shows. With respect to Dub's statement concerning his plans for lunch Arlen White was asked:

"Q. Did he say where he was going?

"A. He was going in to eat a steak dinner with Paul Chambers."

This is actually the only probative evidence in the record justifying his trip by Harold. Therefore, when we consider the evidence which supports the verdict and that which does not, we would be compelled to conclude, if we reached that point, that the verdict is so contrary to the overwhelming weight of all the evidence as to be manifestly unjust, regardless of whether there is some evidence to support it.

The rule in the overwhelming preponderance point is stated and the evidence discussed under the authority of Chief Justice Calvert's statement in 38 Texas Law Review 361 (1960) "No Evidence" and "Insufficient Evidence" Points of Error in the first paragraph on Page 371, as follows:

"In order to avoid having the case returned to it for decision of an 'insufficient evidence' point if the Supreme Court should disagree with it on its 'no evidence' holding, a Court of Civil Appeals may, if it wishes, indicate that the 'insufficient evidence' point would be sustained if reached."

Therefore, we assume if the Supreme Court of Texas does not agree with our holding heretofore made on the "no evidence" point then it will refer the case back to the trial court just as we would do if it were referred back to us.

The judgment of the trial court is reversed and rendered.