**ARGONAUT SOUTHWEST INSURANCE COMPANY, Appellant,**

v.

**Bernice I. DAVIS and James L. Davis, Appellees.**

**No. 11711.**

Court of Civil Appeals of Texas, Austin.

March 4, 1970.

Rehearing Denied April 1, 1970.

Anderson, Henley, Shields, Bradford & Pritchard, L. W. Anderson, Dallas; Small, Herring, Craig, Werkenthin & Shannon, Clint Small, Jr., Austin, for appellant.

Mitchell & Doran, W. Wiley Doran, Houston, for appellees.

O'QUINN, Justice.

This appeal involves two cases, brought separately and consolidated before trial,

for recovery of workmen's compensation benefits growing out of an automobile accident which resulted in the death of one workman and serious injury to another.

The foremost question to be decided is whether the two workmen were in the course of their employment at the time of the accident.

Louis G. Davis, the deceased workman, and his son, James L. Davis, who suffered serious injury, were employed by Best Steel Buildings, Inc., of Houston, in fabricating and erecting a building in Austin for the University of Texas. The men worked through the week prior to the accident, beginning on Monday and until the early part of the afternoon of Sunday, February 26, 1967. At that time they left for Waller and Houston, accompanied by James Davis' wife, in Louis Davis' automobile, a Simca four-door sedan. Louis Davis lived in Waller and his son lived in Houston.

The testimony is in conflict as to whether the Davises were directed by the foreman in Austin to go to Houston to pick up supplies needed for the Austin job next morning. It is undisputed that they went to Houston, spent the night there, did not pick up any supplies for the job, and that early next morning as they were returning to work, with Louis Davis driving, the accident occurred near Austin in which Louis Davis and his daughter-in-law were killed and James Davis received extensive injury.

The jury found in response to special issues that both Louis Davis and James Davis were in the course of their employment for Best Steel Buildings at the time of the accident. The trial court entered judgment awarding recovery of $12,363.82 to Bernice I. Davis, widow of Louis G. Davis, and $19,607.77 to James L. Davis, including $7,974.18 for medical expenses. Attorneys' fees out of these sums were set aside by the court.

Argonaut Southwest Insurance Company, defendant below, has perfected its appeal and assigns twenty points of error.

Appellees have responded with nine counterpoints.

We consider first the points of error under which appellant insurer contends that neither Louis Davis nor James Davis was in the scope of employment when the accident occurred.

Louis Davis and James Davis worked with a crew of several other workmen throughout the week prior to the accident in fabricating a metal building for the University of Texas on a site on West Sixth Street in Austin. The week's work began on Monday, February 20, 1967, and continued until sometime after noon on Sunday, February 26.

The job in Austin was in charge of Bob Drouet, son of August Drouet, one of the owners and an active officer of Best Steel Buildings located on Jones Road near Hempstead Highway on the western outskirts of Houston. There was testimony that the work was stopped early Sunday afternoon due to shortage of screws needed to complete the application of metal sheets constituting sides of the structure, as well as screws to be used later on the roof after the walls were in place. Two witnesses testified that Bob Drouet, as foreman of the job, directed Louis and James Davis to drive to Houston to obtain the needed supplies.

Bob Drouet denied that the shortage of screws caused stoppage of the job, and testified that he stopped the work Sunday afternoon because of high winds, making the handling of insulation sheets difficult. Drouet also testified that the trip to Houston was suggested by Louis Davis, after which Drouet asked Davis to pick up the screws if August Drouet wanted the screws sent to the job in Austin by Davis. Bob Drouet tried to call his father in Houston by telephone before the Davises left, and when he failed to reach his father, Drouet told Louis Davis to call August Drouet on his arrival in Houston.

The statutes pertinent in determining whether the Davises were in the course of

employment are Section 1 of Article 8309, V.A.T.S., and Section 1b, added by the legislature in 1957.

The material part of Section 1 provides that the term "injury sustained in the course of employment" includes "all other injuries of every kind and character having to do with and originating in the work, business, trade or profession of the employer received by an employee while engaged in or about the furtherance of the affairs or business of his employer whether upon the employer's premises or elsewhere."

The Supreme Court held in Texas General Indemnity Co. v. Bottom, 365 S.W.2d 350 (Tex.1963) that the legislature intended by the addition of Section 1b in 1957 "* * * to circumscribe the probative effect that might be given to the means of transportation or the purpose of the journey rather than to enlarge the definition found in Section 1." (365 S.W.2d 353, col. 2.)

Section 1b provides:

"Unless transportation is furnished as a part of the contract of employment or is paid for by the employer, or unless the means of such transportation are under the control of the employer, or unless the employee is directed in his employment to proceed from one place to another place, such transportation shall not be the basis for a claim that an injury occurring during the course of such transportation is sustained in the course of employment. Travel by an employee in the furtherance of the affairs or business of his employer shall not be the basis for a claim that an injury occurring during the course of such travel is sustained in the course of employment, if said travel is also in furtherance of personal or private affairs of the employee, unless the trip to the place of occurrence of said injury would have been made even had there been no personal or private affairs of the employee to be furthered by said trip, and unless said trip would not have been made had there been no affairs or business of the employer to be furthered by said trip."

■ After enactment of Section 1b injuries during travel were held to be in the course of employment only if the employer furnishes the transportation as part of the employment contract, pays for it, or has it under control, or if "the employee is directed in his employment to proceed from one place to another place." Janak v. Texas Employers' Insurance Ass'n., 381 S.W.2d 176 (Tex.1964). The Supreme Court, in following this analysis of the statute, in 1965, held that a carpenter foreman transporting power tools from his home to a new work site, pursuant to his employer's instructions in order to have the tools unloaded and ready for use by carpenters at the start of work, was not in the course of employment because the foreman had not been "directed in his employment to proceed from one place to another place." Agricultural Insurance Co. v. Dryden, 398 S.W.2d 745 (Tex.1965).

In a concurring opinion in Dryden, one justice held the view that as a basis for his claim the foreman was required to prove that (1) his trip to the work site would have been made even had there been no personal or private affairs of his own to be furthered and (2) the trip would not have been made had there been no affairs of business of the employer to be furthered. The justice concurred in the result because "Dryden did not prove that he would not have made the trip but for the necessity of delivering the tools for the employer." (398 S.W.2d 748, col. 1.)

The test there suggested was applied in Cannedy v. Reliance Insurance Co., 425 S.W.2d 420 (Tex.Civ.App., Amarillo, 1968, writ ref. n.r.e.) in which it was held that the employee did not meet either requirement. The Court said the employee (1) "* * * would have had to prove that the mission he was on at the time of the accident would have been made even had there been no personal or private affairs

of his own to be furthered by the trip" and (2) "to prove that the trip * * * would not have been made had there been no affairs or business of the employer to be furthered thereby." The Court held that the employee, a newspaper carrier injured while returning from seeking collections on delinquent accounts after he had already paid the publisher for papers previously delivered to the delinquent customers, "failed in his proof under all the tests laid down under Art. 8309, Sec. 1(4) * * * and under 1b of the same Article." (425 S.W.2d 424, col. 1.)

In Texas Employers Insurance Association v. Brown, 415 S.W.2d 260 (Tex.Civ. App., Amarillo, 1967, writ ref. n.r.e.) the employee was held not to be in the course of employment because under the second part of Section 1b of Article 8309 injuries occurring during travel for the dual purpose of furthering the affairs or business of the employer and the employee's personal or private affairs shall not be deemed in the course of employment unless the trip "would have been made even had there been no personal or private affairs of the employee to be furthered by said trip, and unless said trip would not have been made had there been no affairs or business of the employer to be furthered by said trip." The employee was killed during the noon hour in an accident in the town of Harold, after leaving an oil field where he had repaired the employer's equipment. The route through Harold was not a direct way of return to the employer's shop, but was a direct route to the home of a friend with whom the employee had agreed to have lunch.

The dual purpose of an employee's trip was under consideration in Liberty Mutual Insurance Company v. Preston, 399 S.W.2d 367 (Tex.Civ.App., San Antonio, 1966, writ ref. n.r.e.) in which it was decided that proof that the employer furnished and paid for the transportation satisfied the first part of Section 1b but that the second part of the statute was not satisfied. The employee, who worked for a Houston compa-

ny, left Houston to make a business trip to West Texas on behalf of the employer. He had no set itinerary and combined personal purposes with the business trip. After camping several days in Garner State Park, south of Leakey, the employee was killed driving north toward Leakey. Earlier the employee had indicated to his wife in a telephone conversation he planned to call on a customer in Abilene, about 210 miles north of Leakey. The court held that the proof failed to establish that the trip to the place of occurrence of the injury would have been made even had there been no personal or private affairs to be furthered and that the trip would not have been made if no affairs or business of the employer would be furthered thereby.

On the matter of shortage of materials and the mission to obtain the supplies from Best Steel warehouse near Houston, James Davis testified as set out:

"Q And did you work all day on that Sunday, the 26th?

A No, sir. We—we quit about one-thirty maybe two.

Q In the afternoon?

A In the afternoon.

Q And what were you doing when you quit?

A We was putting on sheet metal and we run out of stitch screws, blue stitch screws. We could have put more sheet metal on.

* * * * * *

Q Is there any significance to the color?

A Yes, sir.

Q Blue?

A The side walls were blue and the roof was white, so we couldn't use none off the roof to go on the side walls, because they was white.

Q You put up the side walls before you put up the roof?

A Yes, sir, we do.

Q Why is that?

A Well, if you don't put the side wall on first, the building won't be completely plumb until you get all the sides and your end walls on, and it's pretty difficult, putting a roof on—putting the side walls on after you put the roof on, anyway.

Q It is customary to put the side walls up first?

A Yes, sir.

\* \* \* \* \* \*

Q All right. And what time was it when you shut down?

A I believe it was about two.

\* \* \* \* \* \*

Q Did you see your father?

A Yes, sir, I did.

Q And where was he in reference to where you were working?

A Well, he was in about the middle of the building. He was talking to Bob Drouet.

Q Was he inside or outside the building?

A Inside the building.

\* \* \* \* \* \*

Q Did you go over to where they were?

A Yes, sir, I did. Yes, sir.

Q And what did you do when you got there?

A Well, I didn't really do nothing. I just come walking up there, and my father and Bob was talking, and Bob was just saying, 'Well, if you all go get them,' you know, 'appreciate it.' So I didn't know what was going on. He said—he told my father to go to Houston and get these stitch screws and some other stuff.

\* \* \* \* \* \*

Q Did you overhear a conversation between Bob Drouet and your father?

A Yes, sir, I did.

Q Would you relate to His Honor and the jury what that conversation was?

A Well, what part of it I heard was just—was Bob telling—well, in Bob's words, he said, 'Well, if you all go, I appreciate it.'

Q Who was he talking to?

A To my father. And so then we started talking about what we needed, where we would be able to go to work the next day, that Monday. If we didn't have the materials, we couldn't work.

Q Was any inventory taken?

A Yes, sir, it was.

\* \* \* \* \* \*

Q And were any notes made?

A Yes, sir, it was. We took a piece of cardboard and wrote down what all we needed on a piece of cardboard.

Q Who did that?

A My father.

Q Was Mr. Drouet standing there?

A Yes, sir, he was.

Q Was that done before or after this conversation about going and getting the stitch screws?

A After.

Q And do you know how many items were listed on the piece of cardboard?

A There was the stitch screws. There were so many blue stitch screws and—self-taps, rather, and so many white ones that they forgot to send for the roof, and there was expense

money and maybe—I am not sure, but I believe a roll of wire mesh on it, chicken wire.

\* \* \* \* \* \*

Q Who all was there when you all were working up this list?

A Well, my father and Bob Drouet, Kenneth Wright, and myself.

\* \* \* \* \* \*

Q All right. Did you and your father then—what did you do?

A Well, after we got everything figured out what we needed to pick up, we followed Bob down to the service station on Sixth down there and he—

\* \* \* \* \* \*

Q All right.

A And so we stopped there at a telephone booth out on the corner by the filling station, and Bob tried to call his father long distance and he never could get ahold of anybody, so he told us to go ahead and go on, he would try to call his father later.

\* \* \* \* \* \*

Q Why did he tell you he was calling his father?

A Why did he tell us?

Q Yes.

A Well, that—to let his father know we was· coming, so he could have the stuff ready that we could return that night or in the morning.

\* \* \* \* \* \*

Q James, had your father said anything to you earlier that day about going to Houston?

A No, sir, he hadn't.

\* \* \* \* \* \*

Q Did you have any plans?

\* \* \* \* \* \*

A No, sir, I hadn't.

Q Why did you go to Houston?

\* \* \* \* \* \*

A Well, Bob Drouet told us—told me to go, me and my father both to go.

Q Did you carry this list with you?

A Yes, sir, we did.

\* \* \* \* \* \*

Q \* \* \* what did you do when you left the service station?

A Well, we went by the motel and picked up my wife—she had been there all day—and asked if she wanted to go along and she did, because she had been there all day, and she wanted to go with us for the ride.

Q Did she go with you?

A Yes, sir, she did.

Q All right; and what time did you all finally get away from Austin, approximately?

A Approximately about three."

The deposition testimony of Kenneth Wright regarding the reason for work stoppage on Sunday afternoon and the subsequent arrangements to obtain the needed materials included the following:

"Q Did you all stop work early that day?

A Yes, sir.

Q What time, approximately, did you stop work on that day?

A Oh, about 2:00, 2:30, something like that.

\* \* \* \* \* \*

Q What caused you to stop work?

A Well, I was working putting a few bolts in that were left out of the purlins. And we didn't have anything else hardly to do. Didn't have the things we needed to go on working.

Q  What materials did you need?

A  Screws.  We were short a roll of chicken wire, which we managed to stretch the other to make up for it.

\*    \*    \*    \*    \*    \*

Q  Now, did you overhear any conversation between the Davises or between Mr. Louis Davis and Mr. Bob Drouet about this shortage of materials?

A  Yes, sir.

Q  Where did that conversation take place?

A  Well, it was in the building and just below where I was working.

Q  Had you stopped working at the time of this conversation?

A  Well, when I found out what the conversation was, I stopped and went down.

Q  What were they doing when you went down?  What was Mr. Louis Davis and Mr. Bob Drouet doing?

A  Discussing the shortage of materials.

Q  Was Mr. Jimmy Davis there?

A  Well, he, just like I, came over to—

Q  Came over?

A  Came over to where they were talking.

\*    \*    \*    \*    \*    \*

Q  Was any count or any notation made of that shortage?

A  It was.

Q  Where was it made?

A  Well, Bob Drouet tore a piece off the box and wrote it on that.

\*    \*    \*    \*    \*    \*

Q  Did you overhear any conversation between Mr. Louis Davis and Mr. Jimmy Davis and Mr. Bob Drouet?

A  I did.

Q  Would you relate what conversation you heard?

A  Well, Bob Drouet told—what's the elder Louis' name?

Q  Louis.

A  I mean, told Louis and Jimmy, he says, 'Why don't you all go to Houston, go to the office and pick up screws, expense money.'

And I'm not positive whether or not he told him to get a roll of chicken wire, too, but I believe he did, because he asked Louis how he would get it in his car.  And he said he would manage.

Q  Did Mr. Louis Davis and Mr. Jimmy Davis agree?

A  They did.

\*    \*    \*    \*    \*    \*

Q  And what happened then?

A  Well, they left.

\*    \*    \*    \*    \*    \*

A.  Well, Bob told them, says, 'You leave early and go on to Houston to the office and pick these things up.'

Q  Told who?  Did he tell Louis Davis?

A  Well, he says, 'Why don't you all go to Houston and pick them up?'

Q  All right.

A  And he was speaking to Louis and his boy.

Q  So, it was you all; is that it?

A  That's correct.

\*    \*    \*    \*    \*    \*

Q  So, you are sure that he said for them to pick this material up?

A  Yes, sir.

Q  Or did he say to call his father while he was in Houston and see whether

or not it was going to be shipped up there?

A He said he was going to call and tell them that they were coming.

\* \* \* \* \* \*

Q Tell them that they were coming?

A To have the expense money and things.

Q Well, now, when did this expense money come up? You didn't tell us about that.

A We got to that later.

Q After you got through the screws?

A Well, the expense money had always been an issue.

Q Oh, it had been an issue?

A For a week it had been an issue.

\* \* \* \* \* \*

Q I see. You were all broke?

A Correct.

\* \* \* \* \* \*

Q Now, what was said with reference to this expense money? You said, 'I'm broke, and I need some money?' Is that in substance what you said?

A I must have said it ten times at least.

Q \* \* \* What did Bob Drouet say with reference to the money business?

A Well, he said to pick up the money along with the screws.

Q I see. He told Louis to pick up the money along with the screws; is that it?

A Well, he said, 'You all go and pick this up,' and he added expense money to it. And Louis was making notations of it. And Bob was—Bob was writing it down and figuring it out.

Q Figuring——

A The amount of screws we needed."

In conflict with the testimony of James Davis and Kenneth Wright is the testimony of Bob Drouet. Drouet testified that Louis Davis told Drouet before noon Sunday that he wanted to leave early that afternoon to go to Houston. Drouet also said that the shortage of materials would not have stopped the work, that the shutdown Sunday afternoon was on account of high winds, and that he asked Davis to call August Drouet while in Houston about the shortage to see whether August Drouet wanted Davis to take the materials on his return to Austin.

This testimony from Drouet appears in the following excerpts:

"Q Did you have any type of conversation with him [Louis Davis] concerning his desire to leave the job and go someplace?

A He said a little earlier that he wanted to go to Houston that day.

\* \* \* \* \* \*

Q Did he say why he wanted to go or give any reason for his going?

A No, sir.

Q Now, after you had this conversation with him what did you tell him with reference to whether or not he could go or not?

A Well, it was all right with me for him to go, and I knew the wind was going to be getting up later that afternoon, and I told him when the wind got up we would just knock the job off.

Q Was it already blowing pretty good around noon?

A Yes, sir, it was blowing fairly well.

Q All right. Why is it, why can't you work on these buildings when the wind blows?

A Well, it blows the insulation, and you can't hardly make it look right and, you know, it is hard to hold.

\* \* \* \* \* \*

Q All right; and what did you do then or—in connection with closing down the job?

A It seemed like it was about 2:30 or 3:00 o'clock we decided to knock off.

Q And why did you decide to knock off?

A The wind was getting too high.

Q All right. Now, was there any shortage of materials in any way that prevented you from going ahead and continuing the work?

A No, sir. We were short on some screws and stuff for the side walls, but we had plenty for the roof, but the wind was blowing too hard to sheet it.

Q Would the wind affect you on the roof, as well as the side walls?

A Oh, yes, sir, more so.

Q Now, did you ever have any conversation with Mr. Louis Davis concerning—about calling your father and making some inquiry in Houston?

A Before they left I went down to a service station and tried to call him and couldn't get in touch with him, and I just asked them to call when they got to town, to save me a long distance call, in case I couldn't get in touch with him.

Q All right. And what did you tell them to tell your father?

A I told them to tell him what we were short and ask him if he wanted them to bring the stuff back up.

Q Now, what were you short of; could you tell us again?

A I believe it was mostly screws.

Q And what type of screws?

A It was the regular screws that you fasten the sides with.

\* \* \* \* \* \*

Q All right; and then that was written down on this piece of cardboard?

A Yes, sir.

Q All right; and you gave that to—you say Louis wrote it down?

A Yes, sir, I believe so.

Q Under your direction?

A Yes, sir.

Q You say that you don't remember exactly what was on that list, but you do know that there were some screws for the side walls?

A Yes, sir.

\* \* \* \* \* \*

Q How many of those come in a box, cardboard box?

A Five thousand.

Q You can get quite a few in a fairly small box?

A Yes, sir.

Q Such a box as would fit in the trunk of a Simca vehicle?

A A box of five thousand would fit in it.

Q And you say that you asked Mr. Davis to take this list and go to Houston, while he was in Houston, and call your father and see if your father wanted him to bring back these supplies?

A Yes, sir. I told him while he was there, to call him and ask him.

Q If he wanted him to bring them back?

A Yes."

Bob Drouet also denied that he asked Louis Davis to pick up expense money

from August Drouet in Houston. He admitted that chicken wire might have been on the list, but did not think it was.

Bob Drouet further testified:

"Q Now, in connection with James Davis—we will talk about him first—did you in any manner direct him to go to Houston and pick up any materials and bring them back to the job, or expense money, or anything else?

A No, sir.

Q Did you in any manner direct Mr. Louis Davis to go to Houston to pick up any materials, expense money, or anything else?

A I told Louis while he was there he could call my dad and ask him if my dad wanted him to carry the stuff back up.

\* \* \* \* \* \*

Q State whether or not he had already planned to go before you discussed this with him.

A Yes, sir, I believe he had."

Two members of the crew testified that Louis Davis wanted to go to Houston on personal business on the Sunday he and James Davis left Austin.

The testimony of John Pirsch was that Louis Davis wanted to visit his family in Houston, as found in the following interrogation:

"Q Now, during the morning or shortly before noon of Sunday, February 26, 1967, did you overhear a conversation between Louis Davis and Bob Drouet concerning a proposed trip that Mr. Davis desired to take?

A Yes.

Q What did you overhear Mr. Davis say to Mr. Drouet?

A There wasn't really too much said specifically except that they would like to go home to visit their family, and that's about all there was to it.

Q All right; and what did Bob Drouet say to him?

A Well, it would be fine if he would like to do it. The wind was starting to be a factor in the sheeting there. We didn't know if we could complete the day there or not for sure."

Samuel Jack Porter, a nephew of August Drouet and a member of the crew, testified that Louis Davis wanted to go to Houston to see about an automobile accident his son had had in Austin. James Davis testified he had had an accident in Austin and that his automobile was in a repair shop in Austin the Sunday he went with his father to Houston. Porter's testimony is quoted:

"Q Now, had you had any conversation with Louis Davis that morning concerning a proposed trip he wanted to make?

A Yes, sir, one—

\* \* \* \* \* \*

Q What was the conversation you had with him earlier that day, that morning?

A Well, we was talking about he wanted to go back to Houston, something about a wreck that this boy had had down there down in—here in Austin.

Q I see. But he wanted to go to Houston to check with someone or—

A Yes, sir, something about the wreck. I don't know exactly what it was. He said something about he wanted to go back that weekend.

Q All right. And did you thereafter have any other—did you thereafter overhear any conversation between Mr. Louis Davis and Bob Drouet concerning a proposed trip that he wanted to make to Houston?

A Yes, sir. They was talking about, he said he wanted to go in and he

asked if it would be all right if he could go into Houston, him and his boy and the boy's wife.

\*   \*   \*   \*   \*   \*

Q And what did Bob Drouet tell him in answer to it?

A He told him it would be all right because the wind was so bad that we wouldn't be able to do anything that required that many men.

Q All right; and about when did this conversation occur, do you recall; was it in the morning or the afternoon or was it around noon or—

A It was around noon, about that time.

Q All right. Now, did they actually quit a little earlier than the rest of you quit?

A Yes, sir.

Q Do you recall the situation involving —well, I will ask you this. Was there any shortage of materials that caused you to quit in any manner?

A No, not for—material that caused us to quit? We needed a few screws but that wasn't nothing to knock off work for."

James Davis testified that he and his father and the rest of the crew ate lunch together on Sunday at which time nothing was said about going to Houston and that the first he heard of the trip was later in the afternoon when he listened to the conversation between Bob Drouet and Louis Davis with reference to calling August Drouet in Houston and picking up screws needed for the job next morning.

After stopping west of Houston in Waller, where Louis Davis lived, the Davises proceeded to the neighborhood of Jones Road, and Louis Davis called August Drouet by telephone. Drouet by deposition testified that Davis reported the shortage of screws and asked whether Drouet wanted Davis to "carry some back" to Austin.

Drouet told Davis that instead he would send the screws to Austin next morning.

August Drouet testified that this conversation took place between 9 and 9:30 o'clock Sunday evening. Louis Davis had learned that his wife was visiting in Houston, and the Davises left Jones Road and went into Houston.

Bernice Davis, widow of Louis Davis, testified that her husband had called her the previous Friday night and told her he would not be home for the weekend because he would be working Saturday and Sunday. Mrs. Davis testified that when Louis Davis arrived in Houston she was surprised and asked why he had come home. Louis Davis told his wife that the job had run short of materials and Bob Drouet, the foreman, had sent him to obtain the needed items.

After spending the balance of the night in Houston, the Davises started back to Austin early Monday morning on the journey that ended in the collision out of which the lawsuits arose.

It is our duty to view the evidence and the reasonable inferences therefrom most favorably in support of the jury's finding.

■ There is no evidence that Louis Davis or James devoted any time to any personal business on the trip. Louis Davis, after joining his wife in Houston, ate a dish of cobbler and went to bed, sometime apparently after 9:30 o'clock Sunday night. James Davis and his wife visited that night with a cousin following a chance meeting. The Davises left Houston early the following morning to arrive at the beginning of a work day on the job site in Austin.

The trial court instructed the jury that "\* \* \* an employee, while traveling on the highway in an automobile, is not considered as being in the course of his employment unless (1) he was traveling on the highway pursuant to direction of his employer, and (2) he would have made the

trip involved had there been no personal or private affairs to be furthered and would not have made the trip involved had there been no business of his employer to be furthered."

In finding that Louis and James Davis were both in the scope of employment at the time of the accident, the jury impliedly found that the Davises went to Houston because they were directed by Bob Drouet, the foreman, to make the trip, and, even if personal or private affairs were involved, they would not have made the trip for personal matters alone, and they would not have made the trip had there been no business of Best Steel to be furthered.

Both James Davis and Kenneth Wright under cross examination admitted that they did not overhear the first part of the conversation between Bob Drouet and Louis Davis. Neither arrived until after each had notice that Drouet and Louis Davis were already talking. Neither witness was able to refute the testimony of Bob Drouet that Louis Davis had planned to go to Houston and suggested to Drouet that he could pick up the materials needed. Consistent with Drouet's testimony is that of James Davis who said he had just " * * * come walking up there, and my father and Bob was talking, and Bob was just saying, 'Well, if you all go get them,' you know, 'appreciate it.' " James Davis also testified, "Well, what part of it I heard was just—was Bob telling—well, in Bob's words, he said, 'Well, if you all go, I appreciate it.' "

James Davis further testified:

"Q Didn't your father already have this deal to go to Houston before you ever came up there?

"A Well, I don't know. I don't know what they was talking about.

"Q Well, of course, I understand that, but you knew something. You could tell from the conversation that had gone on, couldn't you? Was it your father's idea for you to go to Houston?

"A I don't know whose idea it was. Bob Drouet told us to go so we went."

At this point James Davis was examined regarding his testimony previously given by deposition. In the deposition Davis had testified that when he arrived where Bob Drouet and Louis Davis were in conversation, his " * * * father asked him [Drouet] if he wanted us to go to Houston to get * * *" [interruption by counsel]. But in response to the next question, "In other words, your father suggested that trip to him?" James Davis replied, "Yes, sir." At the trial James Davis recalled that such was his testimony at the taking of the deposition and did not recant the statement.

It is undisputed that the Davises did not pick up any materials or expense money while in Houston. Bob Drouet testified that usually materials needed for a job were " * * * either sent out, or if it's something small, sometimes they will let somebody coming that way carry it." There is no evidence that employees were sent in their own vehicles on a trip to pick up materials. There was evidence Bob Drouet had a company pickup with him in Austin.

If the Davises were sent by Bob Drouet to Houston to pick up materials for the Austin job, no part of the mission was performed by them except the telephone call Louis Davis made Sunday night to August Drouet. No further contact was made with the employer, and the Davises devoted the remainder of the time in Houston to their personal pursuits. They were returning to Austin to work the next morning when the accident occurred.

There was evidence that the trip was planned by Louis Davis prior to the time of his conversation with Bob Drouet about calling August Drouet and picking up the screws to bring back to the job. The events which undisputedly occurred are consistent with the evidence that Bob Drouet asked Davis, when he got to Houston, to call August Drouet about the short-

age of materials and ask whether Drouet wanted the Davises to take the screws back with them. It is uncontradicted that August Drouet did not accept Davis' offer to haul the screws and instead sent the materials next day by a company truck. The known events are not consistent with the theory that the Davises would not have gone to Houston except to further the business of the employer and would not have gone solely to further their personal or private affairs.

The testimony of James Davis that Bob Drouet told Louis Davis "to go to Houston and get these stitch screws and some other stuff" and that Bob Drouet told "me and my father both to go" to Houston, and the testimony of Kenneth Wright that Drouet told the Davises "Why don't you all go to Houston, go to the office and pick up screws, expense money" and said, "You leave early and go on to Houston to the office and pick these things up," although contradicted by Bob Drouet, was sufficient, and not against the great weight and preponderance of the evidence, to support a finding that the Davises were directed in the course of their employment to proceed from one point to another.

Even though the claimants met the burden, in our opinion, of showing a directive to proceed from one point to another, there remained the burden of satisfying the requirements of the latter part of Section 1b regarding the dual purpose of their trip. We conclude that the claimants did not prove that the Davises would not have made the trip but for the necessity of picking up the screws for the employer and that they would have gone to Houston even had there been no personal or private affairs to be furthered by the trip.

We hold there was sufficient evidence of probative force to support the implied find-ing that the Davises were directed to proceed from one point to another.

We hold that there was no evidence of probative force that the Davises would have made the trip to Houston had there been no personal or private affairs to be furthered and would not have made the trip and had there been no business of their employer to be furthered.

In holding that there is no evidence to sustain the verdict of the jury as herein indicated, we do not pass upon the assignments that the verdict, in this respect is against the weight and preponderance of the evidence. In the event we are in error in our holding of no evidence, we reserve for future decision the question of the weight of the evidence.

In view of the disposition we make of this appeal under which we reverse and render the judgment of the trial court, we do not reach the other points brought by appellant.

The judgment of the trial court is reversed and rendered.

Reversed and rendered.

### On Motion for Rehearing.

Appellees urge in their motion for rehearing that this Court erred in application of the rule of law by which the evidence must be judged.

In stating the case in our original opinion we had in mind the insufficient evidence points as well as no evidence points. In sustaining the no evidence points, however, we have applied the appropriate rule stated in King v. King, 150 Tex. 662, 244 S.W.2d 660 (1951) and considered only the evidence favorable to the verdict of the jury, discarding all other evidence.

Motion overruled.